**SUSAN MARTIN (AZ # 014226)**
**DANIEL BONNETT (AZ # 014127)**
**JENNIFER KROLL (AZ # 019859)**
**MARK A. BRACKEN (AZ # 026532)**
**MARTIN & BONNETT, P.L.L.C.**
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone: (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com
mbracken@martinbonnett.com

**DANIEL POCHODA (AZ # 021979)**
**ACLU FOUNDATION OF ARIZONA**
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
dpochoda@acluaz.org

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KayAnne Riley, | CASE NO.: |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| City of Prescott, Arizona, a political subdivision; Yavapai Humane Society, an Arizona non-profit corporation; Marlin Kuykendall, individually and in his official capacity as Mayor of the City of Prescott, and Tana Kuykendall, husband and wife; Steve Norwood, individually and in his official capacity as City Manager of the City of Prescott and Shelly Norwood, husband and wife; Ed Boks and Adele Langdon, husband and wife; Marty Goodman and Jane Doe Goodman, husband and wife, | |
| Defendants. | |

1

This is an action for violations of the First Amendment to the United States Constitution, Article II, Sections 5 and 6 of the Arizona Constitution, and the Arizona Employment Protection Act, A.R.S. § 23-1501, *et seq*. This is also an action for tortious interference with an employment relationship, intentional infliction of emotional distress, defamation and false light invasion of privacy.

**INTRODUCTION**

1.     Plaintiff KayAnne Riley was wrongfully terminated by Defendants in violation of her Constitutional, statutory, and common law rights. Defendants retaliated against Plaintiff for expressing her opinions as a private citizen on matters of concern to the community. Plaintiff spoke out against City officials for abusing their power and authority and associated with like-minded persons to participate in a peaceful public demonstration. The underpinnings of our democratic society are threatened when the response to persons exposing government abuse is further abuse.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a), and 42 U.S.C. §§ 1983 and 1988.

3.     The named Defendants, by virtue of their own acts and omissions or by virtue of the acts and omissions committed by one or more of their agents, employees or representatives, as described herein, have conducted business or caused events to occur within the District of Arizona and, more particularly, within Yavapai County Arizona, as more particularly described herein so as to give rise to both subject matter and personal jurisdiction of this Court.

4.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b).

5.     Plaintiff has complied with all conditions precedent to filing an action against a public entity or public employee, pursuant to Arizona's Notice of Claim Statute, A.R.S. § 12-821.01. Plaintiff timely served all named Defendants a statutory Notice of Claim (Exhibit "A"), containing sufficient facts to allow Defendants to understand the basis upon which liability is claimed and a specific amount for which the claims could be

settled and facts supporting the requested amount, as required by A.R.S. § 12-821.01(A). More than 60 days has passed since Plaintiff served each Notice of Claim, and Plaintiff has not received a written response from any Defendants.  Accordingly, the claims are deemed denied, pursuant to A.R.S. § 12-821.01(E).

## **PARTIES**

6.      KayAnne Riley ("Plaintiff" or "Riley") is and was at all times relevant, a citizen of the United States and a resident of the City of Prescott, Arizona.  Ms. Riley is a United States Marine veteran and single mother.  At all times relevant, Ms. Riley was an "employee" of Defendant Yavapai Humane Society.  Ms. Riley was also a "public employee" of the City of Prescott, Arizona, for the purposes of her 42 U.S.C. § 1983 claim for violations of Plaintiff's First Amendment Rights.  Ms. Riley has standing to bring this suit.

7.      Defendant City of Prescott, Arizona ("City of Prescott," "Prescott," or "City") is a political and legal entity existing under the laws of the State of Arizona.  The City of Prescott together with Defendant YHS were, during the relevant time period, joint employers of Plaintiff or, alternatively, were separately Plaintiff's employers for the purposes of Plaintiff's 42 U.S.C. § 1983 claim for violations of Plaintiff's First Amendment Rights.  Upon information, Defendant Marlin Kuykendall was at all times relevant the final decision maker for the practices, policies and operation of the City of Prescott.

8.      At all times relevant, Defendant Yavapai Humane Society ("YHS" or "Humane Society") was and is an Arizona non-profit corporation.  At all times relevant, the YHS had a Animal Sheltering Service Agreement with the City of Prescott and operated as an independent contractor, providing public services for the City of Prescott, and by virtue thereof, Defendant YHS is liable for violations of Plaintiff's Constitutional Rights, under 42 U.S.C. § 1983.  The City of Prescott together with Defendant YHS were, during the relevant time period, joint employers of Plaintiff or, alternatively, were separately Plaintiff's employer for the purposes of Plaintiff's 42 U.S.C. § 1983 claim.

Upon information, Defendant Ed Boks, in consultation with the YHS Board, is the final decision maker for the practices, policies and operation of the YHS.

9.     At all times relevant, Defendant Marlin Kuykendall ("Kuykendall" or "Mayor Kuykendall") was and is an elected public official of the City of Prescott. Defendant Kuykendall held the position of Mayor of the City of Prescott at all times relevant.   Defendant Kuykendall is named as a Defendant herein in both his official capacity and in his individual capacity and, at all relevant times, was acting in both his individual and official capacities as Mayor and agent of the City of Prescott and in the furtherance of his marital community.   Upon information, Defendant Kuykendall exercised supervisory authority over the YHS, the YHS Board, Defendant Boks, and Plaintiff in her position at the YHS, by virtue of the YHS's contract with the City of Prescott.   Defendant Kuykendall exercised supervisory authority over other employees and/or agents of the City of Prescott whom were directly or indirectly involved in one or more decisions affecting Plaintiff's employment status with the YHS, including, but not limited to, decisions regarding discipline and termination as well as the benefits, privileges, terms and conditions of Plaintiff's employment.   Defendant Kuykendall also participated in the decisions and/or discussions leading to Plaintiff's termination from the YHS.

10.    At all times relevant, Defendant Steve Norwood ("Norwood") was employed as the City Manager of the City of Prescott.   Upon information, Defendant Norwood exercised supervisory authority over the YHS, the YHS Board, Defendant Boks, and Plaintiff in her position at the YHS, by virtue of the YHS's contract with the City of Prescott.   At all relevant times, Defendant Norwood was acting in both his individual and official capacities as an agent of the City of Prescott and in the furtherance of his marital community. Defendant Norwood also participated in the decisions and/or discussions leading to Plaintiff's termination from the YHS.

11.    At all times relevant, Defendant Ed Boks ("Boks") was employed by and held the position of Executive Director of the Yavapai Humane Society.  Defendant Boks

4

reports directly to the YHS Board of Directors and exercised direct and/or indirect supervisory authority over Plaintiff and others, whom were directly or indirectly involved in one or more decisions affecting Plaintiff's employment status with the YHS, including, but not limited to, decisions regarding hiring, discipline, and termination, as well as the benefits, privileges, terms and conditions of Plaintiff's employment. At all relevant times, Defendant Boks was acting in both his individual and official capacities as an agent of the YHS and the City of Prescott and in the furtherance of his marital community. Defendant Boks terminated Plaintiff from the YHS based upon pressure from Defendants Kuykendall, Norwood, Goodman, the YHS Board of Directors and/or other individuals unknown at this time.

12.    At all times relevant, Defendant Martin "Marty" Goodman ("Goodman") held the position of Director and/or Member of the YHS Board of Directors. Upon information, Defendant Goodman exercised direct and/or indirect supervisory authority over Plaintiff and over YHS employees, including Defendant Boks, who were directly or indirectly involved in one or more decisions affecting Plaintiff's employment status with the YHS, including, but not limited to, decisions regarding discipline and termination, as well as the benefits, privileges, terms and conditions of Plaintiff's employment. At all relevant times, Defendant Goodman was acting in both his individual and official capacities as an agent of the YHS and/or the City of Prescott and in the furtherance of his marital community. Defendant Goodman participated in the decisions and/or discussions leading to Plaintiff's termination from the YHS.

## **GENERAL ALLEGATIONS**

13.    Ms. Riley was employed by Defendant Yavapai Humane Society ("YHS" or "Humane Society"), from on or about July 2009 to on or about November 2010. Ms. Riley was hired as the Marketing Manager and was later promoted to Marketing and Development Director.

14.    Ms. Riley has over twenty-five years experience working in public relations, marketing, and management. She worked as a military broadcaster and combat

correspondent for nearly ten years while serving in the U.S. Marine Corps and worked for three years on Capitol Hill in Washington, D.C. for Congressmen John Shadegg and Joe Knollenberg.   She has also worked at advertising, marketing, and public relations companies in Phoenix and Prescott, Arizona.  She has also worked as a Vice President and Branch Manager at two banks.

**Animal Sheltering Service Agreement**

15.    The YHS is located in the City of Prescott.  Prescott is a community with a population of approximately 40,000 citizens.

16.    The YHS has an Animal Sheltering Service Agreement ("YHS Agreement") with the City of Prescott, under which the City pays the YHS $49,334 per year.

17.    Pursuant to the YHS Agreement and on behalf of the City of Prescott, the YHS has provided the City of Prescott with animal sheltering and animal control services. These services include receiving and caring for unwanted and stray animals from the Prescott community and impounding of animals involved in bite cases.   Upon information, the City of Prescott only provides these services through its contract with the YHS and does not separately provide these services.

18.    The YHS Agreement expressly states that "YHS is an independent contractor" of the City.  This agreement states that the YHS will use its professional expertise to provide animal sheltering services for the City because, among other things, stray animals "represent a public health, safety and welfare risk to the peace and quiet enjoyment of private property" and "to the citizenry who may come in contact with them."

19.    According to the YHS Agreement, the City "is authorized to control stray animals under A.R.S. Sections 9-499.04 and 9-240(16)" and the City desires to contract "animal shelter services in connection with the exercise of its animal control function."

20.    The YHS Agreement also allows the YHS to use the Prescott Animal Control building at 1605 Sundog Ranch Rd., Prescott, Arizona.   Upon information, this building is owned by the City of Prescott.

///

6

21.     The YHS Agreement further requires YHS to provide monthly and annual reports to the City Council.

22.     In addition, the YHS Agreement states that the services provided must be completed "to the satisfaction of the City," and the contract "may be terminated by the City or YHS upon ninety (90) days written notice, with or without cause."

23.     The YHS Agreement is for a two year period and is set to expire on June 30, 2011.  The contract also provides that at the expiration of the contract "the Prescott City Council shall determine whether to renew the contract…"

24.     The Prescott Police Department, City Manager, and City Finance Director approved and recommended a continuation of the YHS Agreement through June 30, 2013.

25.     On or about June 14, 2011, the Prescott City Council and Mayor considered and passed a resolution to renew the YHS Agreement.  Resolution No. 4082-1152.

26.     According to the new Animal Sheltering Service Agreement, the City will pay the YHS $59,334 per year.  In addition, YHS will collect all fees imposed by City ordinances and will remit the collected fees, except for any boarding fees and $2 for any licenses sold, to the City each month.

**Prescott Citizens Against Bullies**

27.     In October 2010, Ms. Riley helped found a group called the Prescott Citizens Against Bullies (PCAB).  The PCAB was formed to speak out publicly and inform citizens on matters of public concern including, but not necessarily limited to, instances of unfair and unlawful actions by certain public officials and employees, including, City of Prescott officials.  The PCAB included several concerned citizens of Prescott, including former Prescott Mayor Jack Wilson.

28.     The PCAB members would lawfully and publicly assemble and peacefully demonstrate, concerning, among other things, the arrest of Dawn Castaneda, a former City of Prescott employee and manager of the Elk's Opera House.  Soon after Ms. Castaneda was terminated by the City of Prescott, she was arrested on October 13, 2010, on charges of theft and fraudulent use of a city credit card.

29.     The PCAB publicly questioned Ms. Castaneda's termination and subsequent arrest in retaliation for her complaint that her superior, City Administrative Services Director Mic Fenech, berated her and created a hostile work environment.

30.     The PCAB also publicly questioned the Prescott Police Department's use of excessive force to enter Ms. Castaneda's home, while her minor children were present and after she had already been detained at another location, based upon the questionable and trivial charges against her.

31.     The PCAB further publicly questioned ongoing threats, intimidation, and bullying from, or at the direction of, Defendant Kuykendall, Defendant Norwood, and Mic Fenech.

**Public Demonstration Against the City and City Officials**

32.     On or about Tuesday, October 26, 2010, Ms. Riley as a private citizen wrote and issued a press release, on behalf of the PCAB, to the Prescott *Daily Courier* newspaper, regarding a public demonstration at the Prescott City Hall, which was organized by the PCAB.

33.     The following day, on or about October 27, 2010, the *Daily Courier* ran a story regarding the scheduled demonstration.  The story did not reference Ms. Riley or the YHS.

34.     On the morning of October 27, 2010, Ms. Riley advised her supervisor, Ed Boks, the Executive Director of YHS, in a personal email with a link to the *Daily Courier* story to notify him of her participation in the demonstration.  Ms. Riley noted in her email, among other things, that "I did this from my home, at night, on my own computer and my own time."

35.     After Ms. Riley sent her email to Mr. Boks, he called her from his cell phone, while in Los Angeles, to inquire about her participation in the planned demonstration.

36.     Mr. Boks informed Ms. Riley that he had been contacted by a member of the YHS board, Marty Goodman, regarding her involvement in the planned demonstration.

37.     Mr. Boks told Ms. Riley that Mayor Kuykendall had contacted Mr. Goodman and objected to the planned public demonstration and Ms. Riley's involvement.

38.     Ms. Riley explained her involvement in the public demonstration to Mr. Boks and clarified that it would occur during her own time and not while on duty, with her own resources, and that it in no way involved YHS nor her association and employment with YHS.

39.     Mr. Boks told Ms. Riley that he could not tell her how to conduct herself on her own time, but asked that she not participate in this public demonstration on YHS time or with YHS resources.  Ms. Riley agreed and advised Mr. Boks that she had not done so at any time prior to his request.

40.     On or about, Thursday, October 28, 2010, Mr. Goodman visited to the YHS office, at 1625 Sundog Ranch Rd., Prescott, AZ 86301, at approximately 10:00 a.m. Upon information, Mr. Goodman met with Mr. Boks and discussed Ms. Riley's participation in the PCAB and the planned public demonstration.

41.     After the meeting with Mr. Goodman, Mr. Boks informed Ms. Riley that Mr. Goodman had admitted to him that her participation in the demonstration against City officials "was affecting his friendship with the Mayor," and "the Mayor and the entire City Council feel this is a Yavapai Humane Society issue."

42.     Immediately following Mr. Boks meeting with Mr. Goodman, Mr. Boks told Ms. Riley that she was being placed on unpaid administrative leave for two days as a result of her association with the PCAB and its demonstration against the City of Prescott and its officials.  Mr. Boks told Ms. Riley that this action was being taken as a result of Mr. Goodman's comments about the YHS's relationship with the City of Prescott.  Mr. Boks also explained that he had to take action to appease the Mayor and Mr. Goodman.

43.     After Ms. Riley was placed on administrative leave, Jack Wilson distributed, at Ms. Riley's request, a press release on behalf of the PCAB, informing the public that due to ongoing behind-the-scenes retaliation by Mayor Kuykendall, demonstrators were asked to march in masks to avoid retaliation from the Mayor and the City of Prescott.

44.   On or about, Friday, October 29, 2010, Ms. Riley received an email from Mr. Boks, stating that there must have been some "confusion" and that she was actually being placed on "paid" administrative leave.

45.   Mayor Kuykendall held a press conference on late Friday afternoon, on October 29, 2009 at or about 4:00 p.m., to address questions regarding Ms. Castaneda's arrest and claims of intimidation against Ms. Castaneda and her supporters.

46.   On or about, Monday, November 1, 2010, while still on leave from the YHS, Ms. Riley participated in the PCAB's public demonstration at the Prescott City Hall.

47.   The demonstration was held during the lunch hour, between about 11:30 a.m. and 1:00 p.m., so it would not conflict with the demonstrators' work schedules.

48.   Approximately 50 people attended the demonstration, which attracted attention from the local media.

49.   At the public demonstration, Ms. Riley spoke out against Mayor Kuykendall, City Manager Steve Norwood, City Administrative Services Director Mic Fenech, and City of Prescott Police Department on matters of public concern, namely the mistreatment and arrest of former City employee Dawn Castaneda, the excessive force used to invade and search Ms. Castaneda's home, and ongoing threats, intimidation, and bullying from City officials.

50.   The PCAB's public demonstration was on the front page of the November 2, 2010 *Daily Courier* and Ms. Riley was quoted in the story.  In the news article, Ms. Riley was referred to as the "masked leader of the protest rally," and was quoted as saying that some of the demonstrators were wearing masks because "[e]verybody's afraid to speak up."

51.   Ms. Riley's supervisor, Mr. Boks was also identified and quoted in the story.

52.   The *Daily Courier* article only referenced the YHS in so far as it related to Defendants' retaliatory actions against Ms. Riley for her involvement in PCAB and her

participation in the public demonstration.

**Termination From the Yavapai Humane Society**

53.     On or about November 2, 2011, the same day the *Daily Courier* ran its story on the public demonstration, Ms. Riley received a phone call from Mr. Boks at approximately 7:30 a.m., informing her that he was extending her administrative leave "indefinitely."

54.     When Ms. Riley inquired about her extended leave, Mr. Boks responded "that's all I can say."

55.     Mr. Boks further instructed Ms. Riley that she was required to keep her cell phone nearby in case the YHS needed any information from her and she was required to respond immediately.

56.     Upon information, after Mr. Boks' phone call to Ms. Riley, the YHS Board of Directors held a meeting in which they discussed Ms. Riley's involvement in the public demonstration, Defendant Kuykendall's opinion regarding Ms. Riley's public actions, the YHS's contract with the City of Prescott, and Ms. Riley's employment with YHS.

57.     Upon further information, Mr. Boks and/or Mr. Goodman informed the members of the YHS Board that Mayor Kuykendall had either directly or indirectly threatened to cancel and/or not renew the City of Prescott's contract with the YHS because of Mr. Riley's involvement with the PCAB and her participation in the public demonstration against him and other City officials.

58.     Mr. Boks and/or the YHS board determined, at this meeting or sometime shortly thereafter, to terminate Ms. Riley's employment with the YHS.

59.     On or about November 3, 2010, Ms. Riley received an official Notice of Reprimand from Mr. Boks, regarding her participation in the public demonstration.

60.     Prior to receiving this reprimand, Ms. Riley had never received any negative performance reviews, written or verbal, and had been promoted in December of 2009 from Marketing Manager to Director of Marketing and Development.

///

61.     The Notice stated that she was receiving a reprimand for "insubordination." The Notice alleged that Ms. Riley willfully disregarded Mr. Boks' directives not to implicate the YHS in her "personal activities involving a former City of Prescott employee, Dawn Castaneda."

62.     On the same day she received the Notice, Ms. Riley responded to the allegations and emailed her "Points of Disagreement" to Mr. Boks and YHS Human Resource Manager, Aubrey Peterson.   Ms. Riley noted that the Notice contained inaccurate and incomplete information.  She also clarified that the only directive she was given from Mr. Boks was to not participate in the protest on YHS time or on YHS equipment, which she did not.  Ms. Riley also clarified that she never implicated the YHS and that if YHS was implicated at all; it was only through the actions of YHS Board member, Marty Goodman.

63.     On or about November 4, 2010, Ms. Riley reported back to work at the YHS.

64.     After returning to work, Ms. Riley had a meeting, in Mr. Boks' office, with Mr. Boks and Ms. Peterson to discuss the Notice of Reprimand.

65.     At the meeting, Mr. Boks instructed Ms. Riley to sign the Notice of Reprimand.

66.     Ms. Riley explained to Mr. Boks that there were many errors in the Notice of Reprimand and that her recollection of his directives was not consistent with what he had written in the Notice.  She also asked that her points of disagreement be attached to the reprimand and included in her personnel file.

67.     Before Ms. Riley could sign the Notice of Reprimand and attach her points of disagreement, Mr. Boks took the Notice back from Ms. Riley, laid it face down on his desk, and said all he really wanted from Ms. Riley was for her to admit that her participation in the public protest caused collateral damage for the YHS.

68.     Ms. Riley told Mr. Boks that she did not agree that she had caused any harm to the YHS and if there was any harm to the YHS, it was caused by others.

69.     Mr. Boks never offered Ms. Riley another opportunity to sign the Notice and instead told her that she would remain on paid administrative leave indefinitely.

70.     Between November 5 and 11, 2010, Ms. Riley had no direct contact with Mr. Boks but received numerous phone calls from Ms. Peterson, questioning charges on Ms. Riley's YHS credit card.  All of the charges on the YHS credit card were found to be authorized and acceptable business expenses that were permitted within the terms of the YHS credit card agreement.

71.     On November 12, 2010, Ms. Peterson hand-delivered a Letter of Termination from Mr. Boks to Ms. Riley's home.

72.     The Letter of Termination included multiple inaccuracies, inconsistencies, and misrepresentations.  For example, the termination letter falsely stated that Ms. Riley failed to sign the Notice of Reprimand and comply with the terms and conditions of the Notice, although Ms. Riley was never given an opportunity to sign the Notice or comply with any of the terms or conditions that were allegedly included in the Notice.

73.     The termination letter also falsely stated that her "involvement in a public demonstration displayed poor judgment and reflected poorly on the [YHS]."

74.     Upon information, acting separately and/or in concert with one another, the Defendants conspired to terminate Ms. Riley from YHS because of her association in PCAB and her involvement in the public demonstration against the City of Prescott and its officials.

75.     During the relevant period of time and upon information, Defendant Kuykendall directly or indirectly threatened to cancel and/or not renew the City of Prescott's contract with the YHS as a result of Plaintiff's exercise of her federal and state rights.

76.     Upon further information, Defendant Kuykendall has engaged in a pattern or practice of bullying, harassing, and/or retaliating against Prescott citizens that criticize him or other City officials.   For example, Defendant Kuykendall has also, upon information, retaliated against Noel Breen and Deborah Thurston for vocalizing their

opposition to the Mayor and the City's dealings with the Elk's Opera House and Antelope Hills municipal golf course.

77.     The Defendants conspired to stop and/or interfere with Ms. Riley from associating with PCAB and speaking out against the City of Prescott and its officials and retaliated against her for exercising her rights of association, free speech, and peaceful assembly.

78.     The Defendants also retaliated against Ms. Riley for exercising her rights to associate with the PCAB, speak out on matters of public concern, and peaceably assemble as guaranteed by the U.S. Constitution and the Arizona Constitution.

## COUNT I

**VIOLATION OF FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION RIGHTS OF ASSOCIATION, FREE SPEECH, AND PEACEFUL ASSEMBLY – 42 U.S.C. § 1983**

79.     Plaintiff incorporates by reference Paragraphs 1-78 as fully set forth herein.

80.     42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings or redress.

81.     Under the First Amendment to the United States Constitution, a citizen has the right engage in free expression and to peacefully assemble.  The First Amendment includes the right to associate for the purpose of engaging in those expressive activities expressly protected by the Constitution.

82.     The Defendants, while acting in their official and individual capacities and under the color of law, deprived Plaintiff of her Constitutional rights of association, free speech, and peaceful assembly.

83.     The Plaintiff associated with, helped organize, and participated in a public demonstration against the City of Prescott and its officials, including some of the Defendants.

84.     The public demonstration was organized to protest matters of public concern, including City officials' abuse of power and excessive force used against former City employee, Dawn Castaneda, as well as ongoing threats, intimidation, and bullying from City officials.

85.     The Plaintiff's actions were protected under the First Amendment to the United States Constitution.

86.     The Defendants' acted in a manner intended to interfere with and/or prevent Plaintiff from exercising her Constitutional rights and then retaliated against her because she exercised these rights of association, free expression, and peaceful assembly.

87.     In addition, the Defendants' actions had a chilling effect on the Plaintiff's right of association and free expression.  As a result of the Defendants' actions, the Plaintiff has avoided any additional public comments about Ms. Castaneda or the PCAB and has refrained from participating in any other public demonstrations to avoid additional retaliation.

88.     The Defendants were responsible for the Plaintiff's termination from the YHS.

89.     The Plaintiff's association with PCAB, her involvement in the planned demonstration, and her public opinions regarding the City's actions, were the sole, substantial and/or motivating factors for her termination.

90.     Silencing Plaintiff, ending her association with the PCAB, and/or preventing public demonstrations against City and/or City officials were the sole, substantial, and/or motivating factors for the Defendants' actions.

91.     The Plaintiff is treated like a public employee for purposes of determining whether Defendants YHS, Boks, and Goodman violated her First Amendment rights, by virtue of the YHS's status as an independent contractor that provides public services, its

exercise of the City's authority to provide animal control for the public health, safety and welfare of the City's citizens, its requirement to submit monthly and annual reports to the City, its requirement to collect fees on behalf of the City, and its operation of a building owned by the City.

92.     The Defendants impermissibly retaliated against Plaintiff for protected speech because:   (1) Plaintiff spoke on a matter of public concern; (2) Plaintiff spoke as a private citizen, not as a public employee; (3) Plaintiff's protected speech was a substantial or motivating factor for her reprimand and termination; (4) the Defendants do not have an adequate justification for treating Plaintiff differently from other members of the general public; and (5) the Defendants would not have reprimanded or terminated the Plaintiff absent the protected speech.

93.     The Plaintiff's demonstration and protest against the City and City officials and her involvement in the PCAB related to a matters of public concern – public officials' abuse of authority and use of excessive force.  Plaintiff's speech regarding the City's treatment of Ms. Castenada and City official's abuse of authority to intimidate citizens is clearly relevant to the public's evaluation of the City and its official's actions and performance.

94.     At all times relevant, Plaintiff's actions with the PCAB and in the exercise of her Constitutional rights of speech, association, and peaceful assembly, were made entirely on her own time as a private citizen and were in no way related to her employment with the YHS.

95.     At all times relevant, Plaintiff spoke as a citizen and not as part of her official duties for the YHS or in conjunction with her employment at the YHS.

96.     As shown in Plaintiff's Notice of Reprimand and Letter of Termination, but for Plaintiff's affiliation with the PCAB and involvement in a public demonstration against the City and City officials, she would not have been terminated from the YHS.

97.     Upon information, Plaintiff has been ostracized and "black-listed" by other potential employers in the Prescott area as a result of the action of one or more of the

1  Defendants.

2      98.    Defendants Kuykendall, Goodman, Boks, and Norwood are individually

3  liable because they participated in decisions that adversely affected Plaintiff's

4  employment with the YHS and were, at all times relevant, responsible for supervising and

5  establishing and/or maintaining the terms and conditions of Plaintiff's employment.

6  Defendants Kuykendall, Goodman, Boks, and Norwood are also responsible for making,

7  enforcing, and/or changing City and/or YHS policies that affected Plaintiff's employment

8  and the free exercise of her First Amendment rights.  Further, Defendants Kuykendall,

9  Goodman, Boks, and Norwood are personally liable because each, at various times,

10  directly and personally interfered with and/or hindered Plaintiff's right to speak on a

11  matter of public concern and peacefully assembling to protest the actions of City officials.

12  Defendants personally retaliated against Plaintiff for pursuing her rights in violation of

13  clearly established law.

14      99.    As a direct and approximate result of Defendants' violations of the First

15  Amendment, Plaintiff has suffered, is suffering and will continue to suffer economic and

16  non-economic damages in an amount subject to proof.  Plaintiff is also entitled to

17  injunctive and declaratory relief against the Defendants City, YHS, and Mayor

18  Kuykendall, attorneys' fees and costs from all Defendants, and monetary and punitive

19  damages from Defendants Kuykendall, Goodman, Boks, and Norwood in their individual

20  capacity.

21                          **COUNT II**

22                  **WRONGFUL TERMINATION**
23  **(VIOLATION OF THE ARIZONA EMPLOYMENT PROTECTION ACT, A.R.S. §
23-1501 and ARIZONA CONSTITUTION)**

24      100.    Plaintiff incorporates by reference Paragraph 1-99 as fully set forth herein.

25      101.    According to the Arizona Employment Protection Act, "if the termination of

26  the employment relationship violates the public policy of the state as expressly defined in

27  the Arizona Constitution and Arizona Revised Statutes, the employee may bring an action

28  for damages against the employer."  A.R.S. T. 23, Ch. 9, Refs & Annos; *see also* A.R.S. §

23-1501.  An employee has a claim against an employer for termination if the "employer has terminated the employment relationship of an employee in violation of a statute of this state."  A.R.S. § 23-1501(3)(b).

102.   The Arizona State Constitution provides, in pertinent part:

> Right of petition and of assembly.  The right of petition, and of the people peaceably to assemble for the common good, shall never be abridged.

> Freedom of speech and press.  Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

Ariz. Const., Art. II, §§ 5 & 6.

103.   Under Arizona law, each of the Defendants violated Plaintiff's rights to peaceably assemble and freely speak, write, and publish, by intimidating, threatening, condemning, interfering with Plaintiff's employment at YHS, conspiring to terminate Plaintiff from the YHS, and conspiring to prevent Plaintiff from finding future employment in the community.

104.   Each of the Defendants has violated Plaintiff's rights of free expression under Arizona law by retaliating against Plaintiff for publicly organizing and participating in a lawful public demonstration against the City and City officials on matters of public concern.

105.   Defendants Kuykendall, Goodman, Norwood and Boks are individually liable because, as set forth above, each interfered with the exercise of Plaintiff's right to associate, speak, and peacefully assemble, and each personally retaliated against Plaintiff for lawfully pursuing her rights, all in violation of Arizona law.

106.   The Defendants were responsible for the Plaintiff's termination from her employment at the YHS in violation of public policy.

107.   The YHS terminated the Plaintiff because she was associated with PCAB and participated in a public protest against City of Prescott officials and their unfair and unlawful actions against Prescott citizens.

///

108.   The Defendants' actions violated the Plaintiff's rights under the First Amendment to the United States Constitution and Article 2, Sections 5 and 6 of the Arizona Constitution.

109.   It is a violation of public policy to terminate an employee for exercising their rights to the freedom of association, speech, and peaceful assembly.

## COUNT III

### TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP

110.   Plaintiff incorporates by reference paragraph 1-109 as fully set forth herein.

111.   The Defendants intentionally interfered with Plaintiff's employment relationship with the YHS, which caused Plaintiff's termination.

112.   Plaintiff was employed by the YHS and had an expectation of continued employment with the YHS.

113.   Defendants knew that Plaintiff was employed by the YHS.

114.   Defendants Kuykendall, Goodman, Norwood, and/or other currently unknown parties knowingly induced Mr. Boks and the YHS Board to interfere with and terminate Plaintiff's employment at the YHS.

115.   Upon information, after Plaintiff was terminated from the YHS, Defendants intentionally interfered with Plaintiff's expectancy in employment in or around Prescott, Arizona.

116.   Plaintiff has had a difficult time finding any comparable employment in Prescott, Arizona.  Plaintiff has applied for multiple vacant employment positions in or around Prescott and was denied many of these employment opportunities, although qualified for the positions.

117.   Defendants' actions interfered with Plaintiff's expectancy in current and future employment and constitute tortious interference.

118.   By virtue of the forgoing, Defendants' actions have damaged the Plaintiff's reputation in the community and limited her ability to secure future employment.

///

119.   Plaintiff has suffered economic and non-economic damages, including lost past and future wages and benefits and severe emotional distress as a result of the Defendants' actions.

## COUNT IV

## DEFAMATION

120.   Plaintiff incorporates by reference paragraphs 1-119, and paragraphs 128-144, as fully set forth herein.

121.   Upon information, Defendants made defamatory statements that were false and brought Plaintiff into disrepute, contempt, and ridicule.   Defendants' defamatory statements attacked Plaintiff's integrity, virtue, and reputation.

122.   Defendants made false and defamatory statements about Plaintiff, knowing the statements were false and defamatory, in reckless disregard of the truth of the statements, or negligently failing to ascertain the truth of the matters stated.

123.   Defendant YHS's November 12, 2010 Letter of Termination falsely stated that Plaintiff refused to comply with the terms and conditions of her November 3, 2010 Notice of Reprimand.

124.   Defendant YHS's Letter of Termination also falsely stated that her "public actions reflected poorly upon YHS and irreparably damaged [her] credibility as the YHS spokesperson."

125.   Upon information, Defendants' also made statements to the YHS Board of Directors, YHS employees, members of the Prescott community, and/or potential employers that labeled Plaintiff as untrustworthy, disloyal, difficult, radical, incorrigible, unruly, hostile, insubordinate, rebellious, challenging, and/or disruptive.

126.   These false and defamatory statements were made to the public, to YHS employees or board members, and/or prospective employers

127.   Defendants' false and defamatory statements damaged Plaintiff's reputation in the community, caused Plaintiff to lose her job at the YHS, hurt Plaintiff's ability to find future employment, and caused mental and emotional damages.

## COUNT V

### FALSE LIGHT INVASION OF PRIVACY

128.   Plaintiff incorporates by reference paragraphs 1-127 as fully set forth herein.

129.   Defendants made statements that were untrue and intended to misrepresent Plaintiff's character, history, activities and beliefs.

130.   Defendants also made comments or suggestions that created a false implication about Plaintiff.

131.   These false and/or misleading statements were made to the public, to YHS employees or board members, and/or prospective employers.

132.   Defendants knew or reasonably should have known that their statements regarding Plaintiff were false and/or represented her in a false light.

133.   Defendants' false and/or misleading statements damaged Plaintiff's reputation in the community, caused Plaintiff to lose her job at the YHS, hurt Plaintiff's ability to find future employment, and caused mental and emotional damages.

## COUNT VI

### BLACK-LISTED (A.R.S. § 23-1361)

134.   Plaintiff incorporates by reference paragraphs 1-133 as fully set forth herein.

135.   A.R.S. § 23-1361 provides, in pertinent part:

> "Blacklist" means any understanding or agreement whereby the names of any person or persons, list of names, descriptions or other means of identification shall be spoken, written, printed or implied for the purpose of being communicated or transmitted between two or more employers of labor, or their bosses, foremen, superintendents, managers, officers or other agents, whereby the laborer is prevented or prohibited from engaging in a useful occupation. …

A.R.S. § 23-1361(A).

136.   Upon information, Plaintiff has been "black-listed" by other potential employers in the Prescott area as a result of the action of one or more of the Defendants.

137.   After her termination from the YHS, Plaintiff applied to multiple vacant positions in or around Prescott, Arizona.  Despite her qualifications, Plaintiff was denied multiple employment opportunities in or around Prescott.

138.   Upon information, Defendants made false, defamatory and/or misleading statements to prospective employers that prevented Plaintiff from securing a position comparable to the position that she held at the YHS or any employment position.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

139.   Plaintiff incorporates by reference paragraphs 1-138 as fully set forth herein.

140.   Defendants' conduct was extreme and outrageous.  Defendants had no lawful purpose for their conduct and knew, or reasonably should have known, that their actions violated Plaintiff's rights of free expression.  Despite knowledge that their actions violated Plaintiff's civil rights, Defendants acted in a manner that deprived Plaintiff of her constitutionally protected rights.

141.   Defendants' objective was to either cause the Plaintiff emotional distress or they were aware of and disregarded the likelihood that their actions would result in emotional distress.

142.   The Defendants' actions caused Plaintiff embarrassment, humiliation, injury to reputation, mental anguish, and severe emotional distress.

## DAMAGES

143.   As a direct and proximate result of the breach of Plaintiff's rights in each of the above mentioned claims for relief, Plaintiff sustained and continues to sustain substantial injuries including loss of income and damage to her reputation. Plaintiff is entitled to compensation for the harms resulting from the unconstitutional and illegal acts by Defendants.

144.   As set out above, Defendants' actions demonstrated a reckless disregard for the rights and well being of Plaintiff and an intent to harm and humiliate Plaintiff. Defendant Mayor Kuykendall and the City of Prescott have a history of acts of retaliation

against public employees and other Prescott citizens for exercising their First Amendment rights and on information and belief will continue to act in this manner absent legal deterrents. Exemplary damages are required as punishment and to deter Defendants from repeating these abusive and illegal acts in the future.

**WHEREFORE**, Plaintiff prays for the following relief against the Defendants named herein:

A.     A declaration that the Defendants have committed prohibited practices made unlawful by: the First Amendment to the United States Constitution; Article II, Sections 5 and 6 of the Arizona Constitution; and the Arizona Employment Protection Act, A.R.S. § 23-1501.

B.     A declaration that the Defendants are jointly and severally liable to the Plaintiff for both economic and non-economic compensatory damages;

C.     A declaration that the individually named Defendants, acting in their individual capacity, are liable to the Plaintiff for punitive damages to the fullest extent permitted by applicable law, and an award of appropriate punitive damages;

D.     Appropriate preliminary and/or permanent injunctive relief;

E.     Appropriate compensatory damages for Plaintiff's economic and non-economic damages;

E.     An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), A.R.S. § 23-1361(I), and A.R.S. § 12-341.01; and

F.     Such other and further relief as the court deems just and proper.

Dated this 10th day of August, 2011.

MARTIN & BONNETT, P.L.L.C.

By: s/Daniel L. Bonnett
Daniel L. Bonnett
Susan Martin
Jennifer L. Kroll
Mark Bracken
1850 N. Central Ave., Suite 2010
Phoenix, AZ  85004
(602) 240-6900

1

-and-

2

Daniel J.  Pochoda
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
(602) 650-1854

3

4

5

Attorneys for Plaintiff

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28