1   WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8   Kay Anne Riley,                          No. CV-11-08123-PCT-JAT

9
                         Plaintiff,          **ORDER**
10

11  v.

12  City of Prescott, Arizona, a political
    subdivision; Marlin Kuykendall,
13  individually and in his official capacity as
    Mayor of the City of Prescott, and Tana
14  Kuykendall, husband and wife,
15

16                       Defendants.

17          Pending before the Court are defendant City of Prescott, Marlin Kuykendall, and

18  Tana Kuykendall's (collectively, the "Defendants") Motion for Summary Judgment

19  (Doc. 266) and Plaintiff Kay Anne Riley's Motion for Partial Summary Judgment (Doc.

20  271).   Also pending are Plaintiff's and Defendants' Cross-Motions for Discovery

21  Sanctions (Docs. 271, 285) related to the spoliation of email evidence.  Also pending are

22  Plaintiff's and Defendants' Cross-Motions to Strike (Docs. 296, 301) various portions of

23  their several opposing statements of facts (Docs. 267, 272, 280, 286, 288, 292).  All six

24  motions are fully briefed and oral argument on the motions was held on February 11,

25  2014.  The Court now rules on the motions.

26  I.      **BACKGROUND**

27          For purposes of the Court's resolution of the pending summary judgment motion,

28  the Court considers the relevant facts and background, viewed in the non-moving party's

favor,[1] to be as follows.

Plaintiff Kay Anne Riley ("Riley") was employed by the Yavapai Human Society ("YHS") from July 2009 to November 2010.   (Plaintiff's Response to Defendants' Statement of Facts and Additional Statement of Fact in Opposition to Defendants' Motion for Summary Judgment ("PCSOF"), Doc. 280 ¶¶ 21, 106; City of Prescott Defendants' Separate Statement of Facts in Support of Motion for Summary Judgment ("DSOF"), Doc. 267 ¶¶ 21, 106).   Riley was originally hired as the Marketing Manager for YHS and was later promoted to Marketing and Development Director.   (PCSOF ¶ 21).   During the relevant time period, YHS offered animal sheltering and other services to the City of Prescott, operated out of a City of Prescott building, and had a contract with the City of Prescott that provided significant funding for YHS's activities.   (Plaintiff's Statements of Fact in Support of Motion for Partial Summary Judgment ("PSOF"), Doc. 272 ¶¶ 3–4, 7; City of Prescott Defendants' Controverting Statement of Facts Regarding Plaintiff's Statement of Facts in Support of Plaintiff's Motion for Partial Summary Judgment ("DCSOF"), Doc. 286 ¶¶ 3–4, 7).   During all relevant time periods, defendant Marlin Kuykendall ("Mayor Kuykendall") was the elected mayor of the City of Prescott. (PSOF ¶ 11).

In October 2010, Riley co-founded a group called "Prescott Citizens Against Bullies" ("PCAB") for the purposes of raising community awareness of alleged injustice committed against a former City of Prescott employee, Ms. Castaneda.   (PCSOF ¶ 37). On October 26, 2010, Riley issued a press release on behalf of the PCAB regarding a planned November 1 protest against Mayor Kuykendall and various city officials for their purported involvement in the termination of Ms. Castaneda's employment and her subsequent arrest.   (PSOF ¶ 9).

Between October 26 and October 28, Mayor Kuykendall, his assistant, his campaign manager, and other city officials (including councilmembers) communicated

---

[1] In the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party.   *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

1   displeasure with Riley's planned protest, conduct, and speech to each other and to YHS

2   board member Marty Goodman ("Goodman") and Executive Director Ed Boks ("Boks").

3   (PSOF ¶¶ 12–13, 15–22).  On October 28, 2010, YHS placed Riley on administrative

4   leave without pay through November 1.  (PSOF ¶ 23).  Afterwards, Mayor Kuykendall,

5   various city officials, YHS board members, and others continued to communicate

6   regarding Riley's planned protest, conduct, and speech.  (PSOF ¶¶ 24–30, 33).   On

7   October 29, Mayor Kuykendall held a press conference to address the Ms. Castaneda

8   matter and the planned protest.  (PSOF ¶ 31).

9       On November 1, Riley participated in the peaceful PCAB protest.  (PSOF ¶ 34).

10  The protest received local media coverage both before and after it took place.  (PSOF

11  ¶¶ 14, 16, 25, 34, 38; PCSOF ¶¶ 61, 64, 70).  Both before and after the protest, Riley

12  posted several messages on Facebook and other media expressing her opinions regarding

13  Mayor Kuykendall and city officials' bullying tactics and abuse of power against Ms.

14  Castaneda and herself.  (PSOF ¶¶ 12, 25, 30, 39; PCSOF ¶¶ 42–44, 46–47, 50, 54, 79–

15  80).

16      On November 2, Boks notified Riley that her administrative leave was extended

17  indefinitely.  (PSOF ¶ 41).  On November 4, Riley met with Boks and another YHS

18  employee to discuss Riley's employment at YHS.  (PSOF ¶ 50).  During the meeting,

19  Boks expressed concern that the City of Prescott might terminate their contract with YHS

20  because of Riley's protest, conduct, and speech.  (PSOF ¶¶ 51–53).  On November 12,

21  YHS terminated Riley's employment.  (PSOF ¶ 55).

22      On March 1, 2011, Riley served a Notice of Claim on the City of Prescott and

23  Mayor Kuykendall regarding Riley's allegations that the city officials retaliated against

24  Riley's protest, conduct, and speech by threatening economic harm to YHS unless it

25  terminated her employment.  (PSOF ¶ 56).  On August 10, 2011, Riley filed the

26  Complaint (Doc. 1) and commenced the present litigation.

27  **II.   CROSS-MOTIONS FOR SUMMARY JUDGMENT**

28      Defendants move (Doc. 266) for Summary Judgment on Counts I (42 U.S.C.

§ 1983) and III (Tortious Interference With Employment Relationship Under Arizona State Law) of Plaintiff's Complaint (Doc. 1).[2]  Plaintiff cross-moves (Doc. 271) for Summary Judgment on Count III.

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1).  Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the non-movant to establish the existence of material fact. *Id.*  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)).  A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-movant's bare

---

[2] The remaining claims (Counts II, IV, V, VI, and VII) in Plaintiff's Complaint (Doc. 1) were previously dismissed by the Court (Doc. 38).

assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment.  *Id.* at 247–48.  Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (internal citations omitted).

## B.    Count I: 42 U.S.C. § 1983

Riley alleges that she is entitled to relief under § 1983 because she was terminated from YHS in retaliation for her exercise of First Amendment rights.  (Doc. 1 at 14–17, ¶¶ 79–99).

Section 1983 provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."

Defendants argue that they are entitled to summary judgment because there is no dispute of material fact that (1) § 1983 is not available in the instant circumstances; (2) Defendants took no unconstitutional action; (3) the City of Prescott and Mayor Kuykendall, in his official capacity, are not liable under § 1983 for the alleged actions; and (4) Mayor Kuykendall, in his individual capacity, is entitled to qualified immunity. (Doc. 266 at 6–14).

### 1.    Riley Can Maintain a § 1983 Claim

Both parties agree (Doc. 266 at 6–7; Doc. 279 at 4, 6–7) that the Court must evaluate Riley's § 1983 claim through the lens of the Ninth Circuit Court of Appeals'

decision in *Clairmont v. Sound Mental Health* because Riley was a private employee of YHS, an independent contractor for the City of Prescott, and not a public employee of the City of Prescott. 632 F.3d 1091 (2011) (holding that § 1983 can protect the private employee of a government contractor from governmental retaliation for the employee's exercise of First Amendment rights). Defendants contend, however, that as a threshold matter, *Clairmont* requires Riley to show that Defendants "*directly* commanded adverse action against [Riley] or threatened to exert economic pressure on [YHS] if adverse action as not taken against" Riley. (Doc. 266 at 6–7 (emphasis added)). Defendants further argue that "overwhelming" evidence demonstrates that Defendants never directly commanded or threatened YHS. (*Id.* at 7 (citing DSOF ¶¶ 120–70)).

Defendants' insistence that Riley prove "direct" government action, however, mischaracterizes the threshold requirement of *Clairmont*. In *Clairmont*, the Court of Appeals explicitly opined that "First Amendment protection does not depend on whether the governmental action is *direct or indirect*." 632 F.3d at 1100. Rather, "[w]here the government may not prohibit certain speech, it also may not threaten to exert economic pressure on a private employer in order to 'produce a result which [it] could not command directly.' " *Id.* (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (alteration in original) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958))). Thus, *Clairmont* applies and Riley may claim protection from § 1983 whether Defendants exerted direct or indirect pressure on YHS to adversely act against Riley.

Here, it is undisputed that during the relevant time period, YHS had a contract with the City of Prescott wherein the City of Prescott provided YHS with the use of a building and significant funding. (*See* PSOF ¶¶ 3–7; DCSOF ¶¶ 3–7; DSOF ¶ 14; PCSOF ¶ 14). The City of Prescott could terminate the YHS contract without cause. (PSOF ¶ 4; DCSOF ¶ 4). Additionally, sometime between Fall 2010 and Summer 2011, the YHS contract was being renegotiated for renewal. (PSOF ¶ 8; DCSOF ¶ 8). It is also undisputed that, at deposition, Mayor Kuykendall, various YHS board members, and some Prescott city council members testified that Defendants were not involved in the

termination of Riley's employment by YHS.  (*See* DSOF ¶¶ 120–70; PCSOF ¶¶ 120–70).

Riley, however, presents copious evidence calling into dispute the truthfulness and credibility of these assertions.  (*See, e.g.*, PCSOF ¶¶ 120–70; PSOF ¶¶ 17–18, 21–25, 29, 33, 42).[3]  For example, although Mayor Kuykendall and Goodman claim that they never conversed with each other regarding Riley's YHS employment status (DSOF ¶¶ 126, 147), Riley presents an October 28, 2010 email from Goodman (a YHS board member) to Mayor Kuykendall stating

> [Mayor Kuykendall],
>
> Just so you know, I had a meeting this morning with Ed Boks, Director of Yavapai Humane Society.  [Riley] has now been placed on administrative leave and we will review this situation in more detail at our Board Meeting on Monday.  I can assure you that this matter is of our utmost concern we sincerely regret any problems caused by her activities.
>
> Marty [Goodman]

(PSOF ¶ 24 (quoting Ex. 6 of Kuykendall Dep., PSOF at Ex. 23); *see* DCSOF ¶ 24). Similarly, although Mayor Kuykendall testified that he "has never commented to anybody that Riley's activities were affecting the relationship between YHS and the City" (DSOF ¶ 152), Riley presents deposition testimony from Councilwoman Suttles stating that, after the protest, she discussed Riley and YHS's funding with Mayor Kuykendall.  (PCSOF ¶ 152).  Specifically, Councilwoman Suttles testified that she and

---

[3] Defendants object to some of this evidence as inadmissible hearsay. (Doc. 287 at 2–4; DCSOF ¶¶ 18, 21–22, 25, 29, 33).  The Court, however, should consider evidence subject to a potential hearsay objection because it is inappropriate to focus on the admissibility of the evidence's form at the summary judgment stage. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  The focus at the summary judgment stage in the proceeding is the admissibility of its contents. *Id.*  Here, the various emails and documents at issue were purportedly written by various witnesses who have been deposed and may be called to testify at trial.  Consequently, the contents of the emails and documents could be admitted into evidence at trial in a variety of ways.  For example, the emails and documents potentially could be used to refresh a witness' recollection, Fed. R. Evid. 602, or as a prior inconsistent statement for impeachment rather than substantive purposes.  Fed. R. Evid. 613(b); *see United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002); *United States v. White*, 68 F. App'x 870 (10th Cir. 2003).

1   Mayor Kuykendall discussed that "if the city was going to help fund [YHS], how could
2   those people come down and do such a protest" (January 30, 2013 Deposition of Mary
3   Ann Suttles, PCSOF, Ex. 8 at 42:19–43:20), and "that if the city is paying for [Riley] to
4   be part of an organization that is taking care of these animals, how – how do you handle
5   it?"   (*Id.* at 45:2–10).   In sum, if the numerous issues of credibility and conflicting
6   testimony presented by Riley are viewed in a light favorable to Riley, then the summary
7   judgment record could reasonably support a factual finding that Defendants exerted at
8   least indirect economic pressure on YHS to adversely act against Riley.   Accordingly,
9   Riley meets the threshold requirement of *Clairmont* to pursue her § 1983 claim.

10                **2.      Defendants May Have Taken Unconstitutional Actions**

11          Throughout their Motion, Defendants generally argue that they took no
12   unconstitutional actions.  (Doc. 266 at 6–14 ("the Court can start and end by concluding
13   that the facts fail to show that Mayor Kuykendall engaged in any unconstitutional
14   activity"); Doc. 287 at 2–4 ("The first, and foremost, position taken by the City of
15   Prescott Defendants is that they took no unconstitutional action in relation to Plaintiff
16   Riley's employment with YHS.")).

17          Before addressing whether Riley has demonstrated that Defendants violated her
18   constitutional rights, the Court must first determine whether Riley should be considered a
19   governmental employee or a private citizen.  *Clairmont*, 632 F.3d at 1100; *Pickering v.*
20   *Bd. of Educ.*, 391 U.S. 563, 568 (1968) (the State has interests as an employer in
21   regulating the speech of its employees that differ significantly from those it possesses in
22   connection with regulation of the speech of the citizenry in general").  Although it is not
23   in dispute that Riley was a private employee of an independent contractor of the City of
24   Prescott, both parties appear to contend that she should be treated as a governmental
25   employee for purposes of evaluating her First Amendment free speech rights.  (Doc. 266
26   at 11; Doc. 279 at 3).  Thus, the Court, too, will treat Riley as a government employee for
27   the purposes of evaluating her First Amendment free speech rights.

28          *Clairmont* sets out the five-part balancing test to determine whether a

governmental employee has alleged a violation of her First Amendment rights as a result of government retaliation for her speech:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

632 F.3d at 1102–03 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).  The plaintiff bears the burden of proof on the first three areas of inquiry, but the burden shifts to the government to prove the last two.[4]  *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013).

### a.  Riley's Speech was on a Matter of Public Concern

The Court has "defined the scope of the public concern element broadly and adopted a liberal construction of what an issue of public concern is under the First Amendment."  *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709–10 (9th Cir. 2009) (internal quotation marks and citations omitted).

> "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.' " *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).  Speech that deals with "individual personnel disputes and grievances" that "would be of no relevance to the public's evaluation of the performance of governmental agencies" generally is not of public concern.  *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48 (1983).

*Ellins*, 710 F.3d at 1057.

---

[4] Of course, this division of burdens should not be construed as affecting Defendants' ultimate burden on summary judgment of demonstrating "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(a).

1    Here, it is undisputed that on October 26, 2010, Riley issued a press release on

2    behalf of a group called "Prescott Citizens Against Bullies" ("PCAB") that called for a

3    November 1 protest regarding the arrest of former City employee Ms. Castaneda.  (PSOF

4    ¶ 9, Ex. 17; DCSOF ¶ 9).  PCAB alleged that Ms. Castaneda had been fired and arrested

5    for whistleblowing against the City of Prescott.  *Id.*  Riley's press release invited

6    concerned citizens "to join in this peaceful civil protest at City Hall."  *Id.*  Additionally,

7    the press release explained that the purpose of the protest was to oppose the perceived

8    retaliation against Ms. Castaneda, excessive force used by the police when arresting Ms.

9    Castaneda, and "ongoing threats, intimidation, and bullying towards Ms. Castaneda and

10   her supporters by the Mayor" and others.  *Id.*  Such matters are clearly of public concern.

11   *See Eng*, 552 F.3d at 1072 (finding that speech that deals with the functioning of

12   government is a matter of inherent public concern); *Freitag v. Ayers*, 468 F.3d 528, 545

13   (9th Cir. 2006) (speech that helps the public evaluate the performance of public agencies

14   addresses a matter of public concern); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d

15   917, 925 (9th Cir. 2004) (speech alleging that the government engaged in discrimination

16   or other civil rights violations is on a matter of public concern); *Hyland v. Wonder,* 972

17   F.2d 1129, 1137 (9th Cir. 1992) (speech discussing "threats to public safety" is "of vital

18   interest to citizens," and speech exposing policies that put people in jeopardy is

19   " 'inherently of interest to the public.' ") (quoting *Roth v. Veteran's Admin.*, 856 F.2d

20   1401, 1406 (9th Cir. 1988)).

21   Moreover, on October 29, prior to the protest, Mayor Kuykendall and other city

22   officials held a press conference addressing the Ms. Castaneda matter.  (PSOF ¶ 31;

23   DCSOF ¶ 31).  The holding of this press conference strongly implies that Defendants

24   believed the subject matter of the protest was a matter of public concern.  The media

25   coverage received by the protest further evidences its public nature.  (*See* PSOF ¶¶ 14,

26   16, 38; DCSOF ¶¶ 14, 16, 38).  Thus, regardless of any personal animus Riley may have

27   harbored towards Mayor Kuykendall, Riley's speech appears to have been on a matter of

28   public concern.

**b.     Riley's Speech was not Part of Her Official Duties at YHS**

Riley must also demonstrate that the speech in question "was spoken in the capacity of a private citizen and not a public employee."  *Eng*, 552 F.3d at 1071.  A public employee's speech is not protected by the First Amendment when it is part of the employee's official job duties.  *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006).  Whether an employee's disputed speech is part of his official duties presents a mixed question of fact and law.  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008).  For purposes of considering whether Riley spoke in a public or private capacity, at the summary judgment stage we resolve any material factual disputes in Riley's favor.  *Huppert v. City of Pittsburg*, 574 F.3d 696, 701 (9th Cir. 2009).

Initially, the Court notes that Defendants' argument that Riley spoke in a public capacity consists of a single conclusory sentence devoid of citations to the factual record.[5]  (Doc. 266 at 12).  This single sentence fails to meet Defendants' burden of demonstrating that there is no genuine issue of material fact on this point.  *See Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.") (citing *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990)).  Regardless, it is undisputed that Riley had no marketing or public relations responsibility to the City of Prescott.  (*See* DSOF ¶¶ 10, 16, 21, 23; PCSOF ¶¶ 10, 16, 21, 23; PSOF ¶ 2; DCSOF ¶ 2).  It is also undisputed that Riley helped organize and attended the protest on her own personal time, took steps to ensure that her conduct was not attributable to YHS, and YHS did not assist or endorse Riley's actions or speech.  (DSOF ¶¶ 49, 51, 67, 68;

---

[5] "Riley's intentional introduction of YHS into her 'speech,' as well as her attempts to use her YHS-related public persona to advance herself, tends to show that she was speaking, not as a public citizen, but in her continuing role as YHS spokesperson." (Doc. 266 at 12).

PCSOF ¶¶ 49, 51, 67, 68).   Consequently, Riley's speech was not part of her official duties at YHS; she spoke in the capacity of a private citizen and not a public employee.

### c.   Riley's Speech May Have Been a Substantial Motivating Factor in Her Termination

"The third inquiry—whether [Riley's] testimony was a substantial or motivating factor in [her] termination[6]—'is purely a question of fact . . . . [W]e must assume the truth of the plaintiff's allegations.' "  *Clairmont*, 632 F.3d at 1106 (quoting *Eng*, 552 F.3d at 1071).   Defendants claim that they played no role in Riley's termination.  (Doc. 266 at 12).   Rather, they claim that YHS terminated Riley because of her alleged unwillingness to disclaim YHS's involvement in her activities, references to YHS in her speech, and insubordinate conduct.  (*Id.* (citing DSOF ¶¶ 39, 41–58, 63–85, 105–109)).   Riley, however, offers substantial evidence disputing these facts and the credibility of Defendants' witnesses.  (*See* PCSOF ¶¶ 39, 41–58, 63–85, 105–109).   Moreover, Riley offers evidence calling into question whether, during the relevant time period, Defendants communicated with YHS about Riley's employment and whether YHS board members may have felt pressured to terminate Riley's employment.  (*See, e.g.*, PSOF ¶¶ 17–18, 21–25, 29, 33, 42; *but see* DCSOF ¶¶ 17–18, 21–25, 29, 33, 42).   Further, the temporal proximity between Riley's speech and termination create an inference of retaliation. *Paige v. Coyner*, 613 F.3d 273, 283 (6th Cir. 2010) ("Temporal proximity between the protected conduct and the adverse action by the state actor alone may be significant enough to constitute indirect evidence . . . to create an inference of retaliatory motive." (internal citation and quotation omitted)).   Thus, Riley has presented sufficient evidence to create a dispute of material fact whether her speech was a substantial motivating factor in her termination.

### d.   Defendants Failed to Give an Adequate Justification for Treating Riley Differently Than Other Members of the Public

The government bears the burden of showing that under the *Pickering* balancing test, "the relevant government

---

[6] Termination is clearly an adverse employment action.

1
2
3
4
5

> entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. "Although the *Pickering* balancing inquiry is ultimately a legal question, like the private citizen inquiry, its resolution often entails underlying factual disputes." *Eng*, 552 F.3d at 1071. As we have emphasized, we must view all disputed facts in the light most favorable to [Riley]. *Huppert*, 574 F.3d at 701.

*Clairmont*, 632 F.3d at 1106–07. Adequate justification means that "government's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng*, 552 F.3d at 1071 (internal quotation omitted). "These interests include promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." *Clairmont*, 632 F.3d at 1107 (citing *Connick*, 461 U.S. at 150–51). To weigh the parties' respective interests, the Court "examines disruption resulting both from the act of speaking and from the content of the speech." *Id.* Moreover, because Riley's speech is examined in the context of independent contractors, this test is "adjusted to weigh the government's interests as contractor rather than as employer." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996).

Here, Defendants sole argument supporting adequate justification is that Riley's speech and conduct disrupted YHS. (Doc. 266 at 7, 12–13; *see* Doc. 287 at 2–4.) If true, then YHS may have had adequate justification in terminating Riley. Such an argument, however, does nothing to evidence *Defendants*' adequate justification for allegedly applying pressure on YHS to terminate Riley for her speech. Because Defendants have not argued that their interest in regulating Riley's speech was sufficient to outweigh Riley's free speech interest, Defendants have waived this argument. *See, e.g.*, *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008). Regardless, Defendants have neither alleged nor offered any evidence to support a conclusion that pressuring YHS to terminate Riley for her speech was "necessary for [the City of Prescott or Mayor Kuykendall's office] to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419 (citing *Connick*, 461 U.S. at 147). On the record before the Court at this stage in the case, Defendants have not met their burden under the *Pickering* balancing test.

**e.  Defendants Failed to Show That Riley Would Have Been Terminated Even Absent Their Actions**

"[I]f the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating that it 'would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct.' " *Eng*, 552 F.3d at 1072 (alteration in original) (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)).

> In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). This question relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor. It asks whether the "adverse employment action was based on protected and unprotected activities," and if the state "would have taken the adverse action if the proper reason alone had existed."

*Id.* (quoting *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996)). This inquiry is "purely a question of fact" and "we must therefore once again assume the truth of the plaintiff's allegations." *Id.*

Here, Defendants contend that YHS acted independently and terminated Riley's employment for insubordination and poor performance. (Doc. 266 at 7, 12–14 (citing DSOF ¶¶ 39, 41–58, 63–85, 105–109)). Riley, however, disputes Defendants' "facts" and offers deposition testimony and emails from YHS board members suggesting that it was only after Riley's speech and Defendants' subsequent economic pressure that YHS decided to terminate Riley. (*See* PCSOF ¶¶ 30, 39, 41–58, 63–85, 105–109; PSOF ¶¶ 22–24, 33, 42, 48). For example, Riley submits an email from Boks (Director of YHS) that indicates that on the morning of the protest Boks was aware that Defendants may be so upset about Riley's speech that the relationship between Defendants and YHS could be affected. (PSOF ¶¶ 33 (citing Doc. 273, Ex. 29)). Additionally, the temporal proximity between Riley's speech, Defendants' alleged actions, and YHS' termination of Riley creates an inference of retaliation. *See Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) (a causal link may be inferred from proximity in time). Because "[i]mmunity

should be granted on this ground only if the state successfully alleges, without dispute by the plaintiff," that YHS would have taken the adverse action "even absent the questioned speech," the Court concludes that, when viewing the record evidence in the light most favorable to Riley, Defendants have not met their burden on this issue. *Clairmont*, 632 F.3d at 1108 (citing *Eng*, 552 F.3d at 1072). Therefore, Defendants have not demonstrated that they are entitled to summary judgment on this alternative ground.

In sum, on the basis of the summary judgment record and when viewing the record in the light most favorable to Riley, the Court holds that Riley has presented sufficient evidence to establish a genuine dispute of material fact that her speech was constitutionally protected and that Defendants violated her First Amendment rights.

### 3. Riley Can Maintain a § 1983 Claim Against the City of Prescott and Mayor Kuykendall, in His Official Capacity

Defendants argue that the City of Prescott and Mayor Kuykendall, in his official capacity, cannot be liable under § 1983 because Mayor Kuykendall was not a final policymaker with regard to the issues presented in this matter. (Doc. 266 at 7–9). "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dept. of Soc. Servs. of the City of N.Y. et al.*, 436 U.S. 658, 691 (1978). Under *Monell*, municipal liability may be based on any of three theories: (1) an expressly adopted official policy; (2) a longstanding practice or custom; or (3) the decision of a person with final policymaking authority. *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). There is no allegation in this case that a Mayor Kuykendall or other City of Prescott employees were acting pursuant to an express official policy. (*See* Doc. 279 at 12–16). Instead, Riley argues that she is entitled to relief under the second and third *Monell* prongs. (*Id.*).

"[A] local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.' " *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). " 'There must,

1    however, be evidence of a conscious, affirmative choice' on the part of the authorized

2    policymaker." *Id.*  Moreover, "[i]t does not matter that the final policymaker may have

3    subjected only one person to only one constitutional violation." *Lytle*, 382 F.3d at 983.

4    "A municipality can be liable for an isolated constitutional violation when the person

5    causing the violation has final policymaking authority." *Id.* (quoting *Christie v. Iopa*,

6    176 F.3d 1231, 1235 (9th Cir. 1999)).

7         Identifying a policy-making official is a question of law for the Court to decide by

8    reference to state law, not one of fact to be submitted to the jury. *Jett v. Dallas Indep.*

9    *Sch. Dist.*, 491 U.S. 701, 737 (1989); *see Gillette*, 979 F.2d at 1346 ("Whether a

10   particular official has final policy-making authority is a question of state law.") (citing

11   *Jett*, 491 U.S. at 737).  Although the first step in identifying a final policymaker is

12   examination of state law, "[d]epending on the circumstances . . . we may also look to the

13   way a local government entity operates in practice." *Lytle*, 382 F.3d at 982–83 (citing

14   *Jett*, 491 U.S. at 737) (trial judge must identify official policymakers based on "state and

15   local positive law, as well as custom or usage having the force of law") (citation and

16   quotation marks omitted)).   "When determining whether an individual has final

17   policymaking authority, [the court] ask[s] whether he or she has authority 'in a particular

18   area or on a particular issue.' " *Id.* at 983 (emphasis in original) (quoting *McMillian v.*

19   *Monroe County*, 520 U.S. 781, 785 (1997)).

20        Here, Defendants argue that Mayor Kuykendall "was not a final policymaker on

21   the issue of municipal contracts, or the administration or termination of those contracts,

22   nor was he a final policy-maker [sic] with regard to any other issues presented in this

23   matter." Doc. 266 at 9 (citing DSOF ¶¶ 1–6); *see id.* at 7–9; Doc. 287 at 8–11.  Although

24   Riley disputes this (Doc. 279 at 12–14), Defendants are correct insofar as Mayor

25   Kuykendall clearly did not have the authority to unilaterally enter into or cancel the YHS

26   contract.  Article VIII of the City of Prescott Charter codifies Prescott's ability to enter

27   into municipal contracts and specifies that "[t]he city council shall prescribe by ordinance

28   the manner and method of purchases and entering into contracts, the manner and method

of executing change orders, and shall set forth therein the purchases and contract amounts which shall require approval of the city council." City of Prescott Charter, Art. VIII § 3, PCSOF at Ex. 46. The Prescott City Code further provides that the city council must approve municipal contracts, like the YHS contract, that are valued at over $10,000. *See* Prescott, Ariz. Code §§ 1-27-11(C)–(D), 1-27-16 (2013). Furthermore, the YHS contract, itself, specified that "the Prescott City Council shall determine whether to renew the contract" and termination was at the discretion of "the City."[7] (Animal Sheltering Service Agreement, §§ 4(A)–(B), Doc. 267-1 at Ex. A). Thus, with regard to the YHS contract, the Prescott City Council was the final policymaker—not Mayor Kuykendall unilaterally as mayor.

Defendants are incorrect about the status of Mayor Kuykendall not as a final policymaker for municipal contracts, however, insofar as Mayor Kuykendall was indisputably a voting member of the Prescott City Council (DSOF ¶ 2; PCSOF ¶ 2). Under Arizona state law, "[t]he mayor of the common council shall be the chief executive officer of the town, and shall perform such duties as may be prescribed by law and ordinance." A.R.S. § 9-236. The City of Prescott Charter defines the mayor's duties:

> [t]he mayor shall be the chairman of the council and preside over its deliberations. He may make and second motions and shall have a voice and vote in all proceedings. He shall be a chief executive of the city government for all purposes and . . . shall have executive by no regular administrative duties.

City of Prescott Charter, Art. II § 6, PCSOF at Ex. 46.[8]

Of course, as only one of seven members of the Prescott City Council, Mayor Kuykendall could not, in his official capacity as chairman of the Prescott City Council,

---

[7] Although "the City" is not as unambiguous as specifying "the Prescott City Council," the Court interprets the term to refer to the Prescott City Council and not to the mayor of Prescott. This is because the YHS contract never mentions the mayor of Prescott (although the mayor did sign the contract on behalf of the City) and only ever specifies the Prescott City Council. (Animal Sheltering Service Agreement, Doc. 267-1 at Ex. A).

[8] Additionally, "[a]ll contracts shall be . . . executed in the name of the City of Prescott by the mayor." City of Prescott Charter, Art. VIII § 1, PCSOF at Ex. 46.

unilaterally approve renewal of or terminate the YHS contract.  Here, however, the alleged constitutional violation is not direct action by the Prescott City Council.  Rather, Riley alleges indirect action: Mayor Kuykendall's threat of later direct action by the Prescott City Council.  The Ninth Circuit Court of Appeals has held that § 1983 liability can accrue from indirect actions, not only direct actions.  *Clairmont*, 632 F.3d at 1100 ("First Amendment protection does not depend on whether the governmental action is *direct or indirect*. . . . the government . . . may not threaten to exert economic pressure on a private employer in order to produce a result which [it] could not command directly.").  Therefore, it stands to reason that indirect actions by a member of the city council, not only direct actions by the full city council, impute liability onto the municipality.

The alternative to holding the City of Prescott liable for credible threats of adverse policymaking levied by members of the City Council is to hold that the City cannot be liable unless the City Council, as a governing body, officially ratifies the threat through direct action.  Such a holding would absurdly give councilmembers carte blanche to violate constitutional rights through the indirect action of threatening later adverse direct action by the City Council.  Essentially, a party threatened by a councilmember would have only two choices: (1) acquiesce to the threat—an indirect action—and render the City unaccountable because there was no need to follow through with direct City Council action; or (2) resist the threat and hope that the councilmember was bluffing and the City Council takes no adverse direct action.  Either way, unless and until the City Council actually takes direct final policymaking action ratifying the threat, the City remains unaccountable for the earlier threat (an indirect action) by its councilmember.  That cannot be the law because if it were, then the threat, itself clearly unconstitutional under § 1983, would not be a redressable harm.  *See Mi Pueblo San Jose, Inc. v. City of Oakland*, No. C-06-4094 VRW, 2006 WL 2850016, at *4 (N. Dist. Cal. Oct. 4, 2006) (finding that where a municipality argued that multiple city officials were involved in making a final policymaking decision, the law does not allow a municipality to "avoid liability by obscuring its organizational structure and suggesting that the buck stops

1    nowhere"). Such an alternative holding is no alternative, after all. Consequently, Mayor

2    Kuykendall should be considered a final policymaker in the context of his threat of

3    economic harm to YHS via not renewing or canceling its municipal contract.[9]

4         But even if Mayor Kuykendall is not a final policymaker in the instant context, the

5    Court notes that Riley advances an alternative argument to justify attributing *Monell*

6    liability to the City of Prescott. Riley argues that "there is both direct and circumstantial

7    evidence that several City Council members also interfered with her employment[,] . . .

8    expressed dismay and were upset with [Riley's] participation in the protest." (Doc. 279

9    at 14 (citing PSOF ¶¶ 18, 33, 36–37, 44–45 (indicating that it may have been

10   communicated to YHS that multiple councilmembers expressed displeasure with Riley's

11   speech and YHS); *but see* DCSOF ¶¶ 18, 33, 36–37, 44–45)). Although scant, Riley's

12   proffered evidence does raise a genuine dispute of material fact over whether a majority

13   of the City Council exerted indirect economic pressure on YHS to retaliate against Riley.

14   A majority of the City Council is capable of carrying out its threats and therefore surely

15   constitutes a final policymaker in this context.

16        In sum, in this case, Mayor Kuykendall was a final policymaker because, as a

17   member of the Prescott City Council, he had a portion of the final policymaking authority

18   of the City of Prescott for purposes of the YHS contract. Alternatively, in the context of

19   a threat of later direct City Council action, a majority of the members of the Prescott City

20   Council constitutes a final policymaker for purposes of *Monell* liability. Accordingly,

21   Riley may maintain her § 1983 claim against the City of Prescott and Mayor Kuykendall,

22

23   _____

24        [9] The Court notes that Mayor Kuykendall's dual status as chief executive of the
     City of Prescott and chairman of the Prescott City Council undoubtedly provided him
25   significant influence over the Prescott City Council and its policymaking. This obvious
     influence would have provided significant credibility to Mayor Kuykendall's threat of
26   economic pressure if YHS did not retaliate against Riley. Moreover, because of Mayor
     Kuykendall's elevated stature on the Prescott City Council, YHS could have reasonably
27   believed that Mayor Kuykendall's threats represented the position of other
     councilmembers and the City Council, as a body. (*See* PSOF ¶¶ 18, 33, 36–37, 44–45
28   (indicating that it may have been communicated to YHS that other councilmembers
     expressed displeasure with Riley's speech and YHS); *but see* DCSOF ¶¶ 18, 33, 36–37,
     44–45).

1  in his official capacity. [10]

2  ### 4.   Mayor Kuykendall, in His Personal Capacity, is Not Entitled to Qualified Immunity

3  Defendants argue that Mayor Kuykendall, in his personal capacity, is entitled to

4  qualified immunity because he took no unconstitutional action and, even if he did,

5  Riley's constitutional right was not clearly established at the time of the violation.  (Doc.

6  266 at 9–14; Doc. 287 at 4–8).  A defendant in a § 1983 action is entitled to qualified

7  immunity from damages for civil liability if his or her conduct does not violate clearly

8  established statutory or constitutional rights of which a reasonable person would have

9  known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  There is a two-step sequence

10  for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified

11  immunity inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "constitutional

12  inquiry" asks whether, when taken in the light most favorable to the non-moving party,

13  the facts alleged show that the official's conduct violated a constitutional right.  *Id.*  If so,

14  a court turns to the "qualified immunity inquiry" and asks if the right was clearly

15  established at the relevant time.  *Id.* at 201–02.  This second inquiry "must be undertaken

16  in light of the specific context of the case, not as a broad general proposition."  *Id.* at 201.

17  Courts are "permitted to exercise their sound discretion in deciding which of the two

18  prongs of the qualified immunity analysis should be addressed first in light of the

19  circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236

20  (2009).

21  First, regarding the "constitutional inquiry," after performing the 5-step *Clairmont*

22  inquiry above, the Court finds that Riley has presented sufficient evidence to establish a

23  genuine dispute of material fact that her speech was constitutionally protected and that

24  Defendants violated her First Amendment rights.   Second, regarding the "qualified

25  immunity inquiry," "it is well settled that the state may not abuse its position as employer

26

27  [10] In light of the Court's conclusion that Riley's rights were allegedly violated by a
"final policymaker," the Court need not address Riley's alternative ground for municipal

28  liability under *Monell* (that the City of Prescott's retaliation against Riley was pursuant to
a longstanding practice or custom (Doc. 279 at 15–16)).

to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.' "  *Eng*, 552 F.3d at 1070 (quoting *Pickering*, 391 U.S. at 568).  Additionally, the Court previously found that Riley's constitutional right to engage in free speech free of government interference was clearly established when she was terminated from YHS.  (Doc. 38 at 7 (citing *Clairmont*, 632 F.3d at 1100) ("Where the government may not prohibit certain speech, it also may not threaten to exert economic pressure on a private employer in order to produce a result which [it] could not command directly.")).  Accordingly, Mayor Kuykendall, in his personal capacity, is not entitled to qualified immunity.

In sum, (1) Riley can maintain her § 1983 claim; (2) there is a dispute of material fact whether Defendants took unconstitutional action; (3) the City of Prescott and Mayor Kuykendall, in his official capacity, are proper defendants; and (4) Mayor Kuykendall, in his private capacity, is not entitled to qualified immunity.  Because Defendant has failed to demonstrate that there is not a genuine dispute of material fact, Defendant is not entitled to summary judgment on Riley's § 1983 claim.  Accordingly, the Court denies Defendants' Motion for Summary Judgment (Doc. 266) with respect to Count I.

### C.     Count III: Tortious Interference with Employment Relationship

Riley alleges in Count III of her Complaint (Doc. 1 at 19–20, ¶¶ 110–19) that Mayor Kuykendall intentionally interfered with Riley's employment relationship with YHS by threatening to cancel or not renew the YHS contract because of Riley's involvement with the PCAB and her participation in the public demonstration against him and other city officials.  Riley alleges that this threat ultimately led to her termination from YHS.  Defendants (Doc. 266 at 14–16) and Riley (Doc. 271 at 7–12) have each moved for summary judgment on Count III.

#### 1.     Legal Standard

"Tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another if the interference causes the plaintiff to lose a right under the contract."  *Snow v. Western Sav. & Loan*

*Ass'n,* 730 P.2d 204, 211 (Ariz. 1986) (internal citations omitted). "To plead a prima facie case of intentional interference with contract, the plaintiff must allege: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference inducing or causing a breach; (4) resultant damage to the party whose relationship has been disrupted; and (5) that the defendant acted improperly." *Id.* (internal quotations and citations omitted).

### 2. Analysis

#### a. Defendants' Motion for Summary Judgment

In their motion, Defendants do not mention elements one, two, and four (Doc. 266 at 14–16), and therefore concede at least that those elements are in dispute. Defendants, however, argue that Riley cannot meet her burden on elements three and five by claiming, without specificity, that "there are no facts showing that the City of Prescott Defendants engaged in any actions that induced or caused a breach of Riley's employment contract, or that the City of Prescott Defendants engaged in any *improper* action that caused Riley's job termination." (Doc. 266 at 15) (emphasis in original). Defendants are incorrect on both elements.

Regarding element three, first, as discussed above, Riley has demonstrated there is a genuine dispute of material fact whether Mayor Kuykendall threatened economic harm to YHS if YHS did not terminate Riley's employment. *Supra*, II.B.2. Riley also offers evidence calling into question whether, during the relevant time period, Defendants communicated with YHS about Riley's employment and whether YHS board members may have felt pressured to terminate Riley's employment. (*See, e.g.*, PSOF ¶¶ 17–18, 21–25, 29, 33, 42; *but see* DCSOF ¶¶ 17–18, 21–25, 29, 33, 42). Lastly, Riley offers deposition testimony and emails from YHS board members suggesting that it was only after Riley's speech and Defendants' subsequent economic pressure that YHS decided to terminate Riley. (*See* PCSOF ¶¶ 30, 39, 41–58, 63–85, 105–109; PSOF ¶¶ 22–24, 33, 42, 48). Consequently, element three is in genuine dispute.

Regarding element five, whether Defendants' actions were improper, the Supreme

Court of Arizona has opined that "the 'improper' element . . . 'generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded.' " *Safeway Ins. Co., Inc. v. Guerrero*, 106 P.3d 1020, 1026, ¶ 21 (2005) (quoting *Snow v. Western Sav. & Loan Ass'n*, 730 P.2d 204, 212 (Ariz. 1986)). Here, Defendants' alleged actions were clearly improper. As discussed above, the Court finds that Riley has demonstrated that there is a genuine dispute of material fact whether Mayor Kuykendall threatened economic harm to YHS if YHS did not terminate Riley's employment. *Supra*, II.B.2. Riley has also demonstrated a genuine issue of material fact whether such threat was unconstitutional. *Id.* Because an unconstitutional action is inherently improper, element five is in genuine dispute.

Because Defendant has failed to demonstrate that there is not a genuine dispute of material fact, Defendant is not entitled to summary judgment on Riley's tortious interference claim.[11] Accordingly, the Court denies Defendants' Motion for Summary Judgment (Doc. 266) with respect to Count III.

### b.    Riley's Motion for Partial Summary Judgment

In her motion, Riley argues that there is no genuine dispute of material fact as to elements one (Riley was employed by YHS), two (Defendants were aware of Riley's employment), and four (Riley suffered damages caused by the termination of her employment). (Doc. 271 at 8). Riley also argues that "[t]he Court should find as a matter of law that there is no genuine dispute as to element [three] (intentional interference) and [five] (improper conduct), based on undisputed facts as further supported by Defendants' spoliation of evidence." (*Id.*).

First, the Court notes that Defendants have offered copious evidence disputing the

---

[11] The Court notes that Defendants also argue that the City of Prescott is entitled to summary judgment because Riley has no evidence that the alleged tortious conduct was committed by an employee of the City of Prescott in the course and scope of his employment. (Doc. 266 at 16–17). Here, it is undisputed that Mayor Kuykendall and the councilmembers' scope of employment includes the negotiation, renewal, and cancelation of municipal contracts. Thus, the pressure allegedly applied by Mayor Kuykendall and other councilmembers on YHS concerning the municipal contract is within the scope of the Mayor and the councilmembers' employment.

factual basis of Riley's claim.  Specifically, Defendants have demonstrated a reasonable dispute of material fact over whether Mayor Kuykendall threatened economic harm to YHS if YHS did not terminate Riley's employment.  It is undisputed that, at deposition, Mayor Kuykendall, other councilmembers, and various YHS board members testified that Defendants were not involved in the termination of Riley's employment by YHS. (DSOF ¶¶ 120–70; *see* PCSOF ¶¶ 120–70 (admitting that deponents testified as noted, but disputing the truthfulness of the statements)).  Although Riley presents abundant evidence challenging the credibility of the deponents testimony (*see, e.g.*, PCSOF ¶¶ 120–70; PSOF ¶¶ 17–18, 21–25, 29, 33, 42), credibility determinations are within the province of the jury, not the Court at the summary judgment stage.  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (internal citations omitted).  When viewed in the light most favorable to the non-moving party (here, Defendants), there is a genuine dispute of material fact over whether Defendants acted intentionally or improperly.

Second, Riley's reliance on sanctions for Defendants' spoliation of evidence is unwarranted and does not entitle Riley to summary judgment on Count III.  As explained below, *infra* III.A.3.d., Riley is entitled to an adverse inference jury instruction, not the factual findings she seeks.  Unlike a factual finding, at the summary judgment stage an adverse inference jury instruction does not resolve the genuine factual disputes presented here.  Accordingly, the Court denies Riley's Motion for Summary Judgment (Doc. 271) with respect to Count III.

## III.    CROSS-MOTIONS FOR DISCOVERY SANCTIONS

Riley's Motion for Partial Summary Judgment includes a Motion for Discovery Sanctions.  (Doc. 271 at 12–21).  Defendants include in their Response a Cross-Motion for Discovery Sanctions.  (Doc. 285 at 23–25).

### A.    Riley's Motion

Riley argues (Doc. 271 at 12–21) that she is entitled to claim-dispositive sanctions due to Mayor Kuykendall's alleged spoliation of various email evidence.

Defendants must be sanctioned for their willful misconduct. This Court should, as a sanction, find that the spoliated evidence would have established (1) Defendants intentionally interfered with Riley's employment relationship causing her termination, and (2) Defendants' conduct was improper. Upon making this determination, the Court should grant summary judgment in [Riley's] favor on her tortious interference claim.

(Doc. 271 at 19).

### 1.    Evidence of Spoliation

Riley argues that the following facts show that Mayor Kuykendall has destroyed or failed to preserve email evidence relevant to this litigation:

- Although Riley has made multiple requests for production of emails between Defendants and YHS, and specifically between Mayor Kuykendall and Goodman, Defendants have not produced such emails.  (Doc. 271 at 6, 16; PSOF ¶¶ 62, 65, 67, 74, 76–77).   Moreover, Mayor Kuykendall explicitly denied that he and Goodman communicated by email.   (PSOF ¶ 84; DSOF ¶ 84 ("the Mayor's position [is] that he does not use email")).

- Nonetheless, Riley discovered numerous emails relevant to this litigation where either Mayor Kuykendall or his assistant were senders or recipients of the emails. These emails were discovered from third-parties, YHS, Goodman, and Google, Inc.  (Doc. 271 at 6; PSOF ¶¶ 67, 74–83).

- On March 1, 2011, Riley served the City of Prescott and Mayor Kuykendall with the Notice of Claim.  (PSOF ¶ 56; *see* DCSOF ¶ 56 (acknowledging that Mayor Kuykendall received the Notice of Claim)).

- On May 18, 2011, Riley served a Public Records request on the City of Prescott requesting, among other things, emails between Mayor Kuykendall and YHS, Boks, or Goodman.  (PSOF ¶ 62; DCSOF ¶ 62; DSOF at Ex. 53).

  - Mayor Kuykendall had the responsibility to locate and produce records responsive to a public records request, although the IT Department was available to assist with the process.  (PSOF ¶ 63; DCSOF ¶ 63).

- On August 15, 2011, Riley sent Defendants a Notice of Request to Preserve Documents and Electronically Stored Information.  (PSOF ¶ 65; DCSOF ¶ 65).

- On July 16, 2012, Riley discovered twenty-four emails potentially relevant to this litigation through Google, Inc's search (pursuant to subpoena) of Mayor Kuykendall's private email address.  This discovery revealed only the "to," "from," and "date" fields of the email, not the subject line or body.  (Doc. 171 at 16; PSOF ¶ 74).

  o Riley had previously requested these emails on May 18, 2011 and May 15, 2012.  Riley again requested Defendant produce these emails on July 30, 2012.  (PSOF ¶ 76; DCSOF ¶ 76).  Defendants did not search Mayor Kuykendall's home computer and personal email account until August 16, 2012.  (PSOF ¶ 78).  Defendants produced none of the twenty-four emails from the Google list.  (PSOF ¶ 77; DCSOF ¶ 77).

- On or about October 30, 2012, five emails were discovered through third-party Goodman (pursuant to a subpoena).  Three of these emails were from Goodman to Mayor Kuykendall and two of these emails were from Mayor Kuykendall's assistant to Goodman.  This discovery revealed the full text of all five emails.  (PSOF ¶ 67; DCSOF ¶ 67).  Defendants had not previously produced these emails.

- On March 19, 2013, over Defendants' objections, Riley obtained a court order directing Google, Inc. to produce copies of each of the twenty-four emails previously identified in Mayor Kuykendall's private Gmail account.  On or about March 25, 2013, Google, Inc. searched its servers but "did not identify or locate among its business records" any of the twenty-four emails.  (PSOF ¶¶ 79–80; DCSOF ¶ 79).  Google's Custodian of Records produced a declaration confirming that, on July 16, 2012, the twenty-four emails existed in Mayor Kuykendall's Gmail account, but that "[r]ecords regarding whether, when, how or by whom any emails that may have existed were deleted are not reasonably accessible to Google."  (PSOF at Ex. 51; DCSOF ¶ 80 (acknowledging the contents of the

declaration, but objecting that the declaration "leaves open the possibility that an employee of Google may have taken some action, either in July 2012 or March 2013[,] that resulted in the deletion of emails from the Mayor's Google-maintained e-mail account")).  Defendants have not produced any of these twenty-four emails.

In Response, Defendants deny destroying evidence relevant to this case during the period when Defendants were obligated to preserve evidence.  Specifically, Defendants allege that Mayor Kuykendall is neither proficient in nor a regular user of email.  (Doc. 285 at 7).  With regard to Mayor Kuykendall's city-assigned email account, Mayor Kuykendall alleges that it is his assistant, not himself, who accesses and uses his city-email account.  (DCSOF ¶¶ 75, 99).  Mayor Kuykendall also claims that due to City of Prescott IT limitations, his city-emails are not archived and his assistant regularly deletes emails after approximately two weeks.  (DCSOF ¶¶ 39, 58–60, 69–71, 114–17).  Mayor Kuykendall further explains that the City's email server only stores user-deleted email for 30 days.  (DCSOF ¶¶ 61–64).  Mayor Kuykendall argues that consequently, any of Mayor Kuykendall's city-emails relevant to this litigation would have been routinely deleted and irretrievable prior to receipt of Riley's Notice of Claim on March 1, 2011.[12]

With regard to Mayor Kuykendall's private Gmail account, Mayor Kuykendall alleges that it is his wife, not himself, who accesses and uses his Gmail account. (DCSOF ¶¶ 81–85).  Mayor Kuykendall also claims that his wife uses his Gmail account to correspond with his assistant and campaign manager.  (DCSOF ¶¶ 83–85, 108–10). Mayor Kuykendall further claims that he has insufficient technical knowledge to delete emails from his personal account, and that he is not aware of anyone taking affirmative steps to delete emails from his Gmail account during the pendency of the litigation. (DCSOF ¶¶ 111, 113).  Additionally, Mayor Kuykendall argues that the Google declaration is insufficient to justify sanctions because it does not specify the source of the

---

[12] Riley's YHS employment was terminated on November 12, 2010, over three months prior to the Notice of Claim.

1    emails' deletion, whether a technological glitch could be to blame, or whether a Google

2    employee could be responsible.[13]  (Doc. 285 at 10).

3        Aside from arguing that no emails were destroyed during the period when

4    Defendants were obligated to preserve them, Defendants argue that the alleged spoliation

5    does not hamper Riley's ability to prosecute her case because she had access to

6    Goodman's email, and therefore had access to any relevant emails between Mayor

7    Kuykendall and Goodman.[14]  (Doc. 285 at 10–11).  Consequently, Defendants argue that

8    their actions warrant no sanctions of any kind.  (*Id.* at 15–18).

9                    **2.    Legal Standard**

10       The Court has discretion under its inherent powers to sanction a party who causes

11   the spoliation of evidence.  *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.

12   2006).  This discretion is broad and can range from minor sanctions, such as the awarding

13   of attorneys' fees, *Leon*, 464 F.3d at 961, to more serious sanctions, such as dismissal of

14   claims, *id.* at 958, or instructing the jury that it may draw an adverse inference, *In re

15   Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386–87 (9th Cir. 2010).  Sanctions under these

16   "inherent powers must be exercised with restraint" and should be appropriate to the

17   conduct that triggered the sanction.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45

18   (1991).

19       Destruction of evidence or the failure to preserve property for another's use as

20   evidence in pending litigation constitutes spoliation.  *See United States v. Kitsap

21   Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002).  Specifically, failure to "preserve

22   electronic or other records, once the duty to do so has been triggered, raises the issue of

23   spoliation of evidence and its consequences."  *Surowiec v. Capital Title Agency, Inc.*, 790

---

24       [13] Mayor Kuykendall also implies that because an email could linger on Google's
25   servers for up to 60 days beyond the date of user deletion, the twenty-four emails could
     have been deleted up to 60 days prior to Google's July 16, 2012 response to Riley's
26   subpoena.  (Doc. 285 at 10).  Considering that March 1, 2011 was over 400 days prior to
     July 16, 2012, it is unclear how this fact, even if true, could possibly excuse the
27   disappearance of the twenty-four emails.

28       [14] Riley responds that the five Goodman emails are only a fraction of the emails
     Mayor Kuykendall destroyed.

F.Supp.2d. 997, 1005 (D. Ariz. 2011) (quoting *Thompson v. U.S. Dep't. of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)); *see also Leon*, 464 F.3d at 959 (noting willful destruction of electronic files constituted spoliation).

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]" *Surowiec*, 790 F.Supp.2d at 1005 (quoting *Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 509 (D. Md. 2009)).  The Court will now examine each of these elements to determine if Riley has sufficiently established that Mayor Kuykendall engaged in conduct that led to the spoliation of evidence and warrants sanctions.

### 3.   Analysis

#### a.   Obligation to Preserve

"It is well established that the duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Surowiec*, 790 F.Supp.2d at 1005 (internal citation and quotation omitted).  "Stated differently, the duty to preserve is triggered not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Id.* (internal citations omitted).  At the very latest, Mayor Kuykendall's duty to preserve the contents of his city-assigned email account and private Gmail account arose when he received Riley's Notice of Claim on March 1, 2011.  Riley, however, argues that Defendants' obligation to preserve evidence in both email accounts arose earlier.  The Court will address each account in turn.

#### 1.   Mayor Kuykendall and City Employee's City-Assigned Email Addresses

Defendants argue that no spoliation of emails from Mayor Kuykendall's city-assigned email account occurred because any relevant emails would have been routinely deleted prior to March 1, 2011, the date when Defendants argue an obligation to preserve

evidence arose.  Riley, however, argues that Defendants had a preexisting duty to preserve relevant emails because: (1) Mayor Kuykendall and City employees are public officers subject to state public records laws and regulations; and (2) the City had a contractual business relationship with YHS.  Specifically, Riley argues (Doc. 271 at 13–15) that applicable Arizona public records laws, A.R.S. §§ 39-121, *et seq.*, obligated Defendants to preserve all emails related to municipal contracts (which would include emails related to YHS and, by extension Riley, during the entirety of all events alleged by Riley).  Riley appears to argue that because Arizona's public records laws are designed, in part, to preserve documents of legal significance,[15] Defendants either knew or should have known that emails related to a municipal contract hold legal significance that obligate their preservation.

The Court notes that although Defendants have responded to most of Riley's spoliation argument in their Response, they ignore this argument.[16]  (Doc. 285 at 6–9, 13–14).  Consequently, for the purposes of this motion, the Court will consider Defendants to admit that under Arizona public records laws, Defendants became obligated to preserve emails between city employees and YHS at some point prior to October 26, 2010, the date Riley first publicized the protest.  From the facts presented at this stage of the hearing, it is not in dispute that sometime after October 26, 2010, multiple emails potentially relevant to this litigation were deleted from Mayor Kuykendall's city-assigned email account.   Accordingly, with regard to Mayor Kuykendall's city-assigned email account, Riley has made a showing that spoliation occurred after Defendants' duty to preserve evidence had arisen.

---

[15] "Records shall not be destroyed or otherwise disposed of by any agency of this state unless it is determined by the state library that the record has no further administrative, *legal*, fiscal, research or historical value."  A.R.S. § 41-151.15(B) (emphasis added).

[16] Defendants argue (Doc. 285 at 13–14) that Mayor Kuykendall merely followed the established City of Prescott IT policy between October 26 and March 1, 2011.  This argument goes to culpability, not Defendants' underlying obligation to preserve evidence.

### 2.   Mayor Kuykendall's Private Gmail Account

At the very latest, Mayor Kuykendall's duty to preserve the contents of his private Gmail account arose when he received Riley's Notice of Claim on March 1, 2011. From the facts presented, it appears that Mayor Kuykendall's private Gmail account contained emails relevant to this litigation on March 1, 2011.  Twenty-four identified emails appear to have been deleted from Mayor Kuykendall's personnel Gmail account no earlier than mid-May, 2012, more than one year after Mayor Kuykendall knew of his obligation to preserve evidence.  Nonetheless, despite multiple requests from Riley, Mayor Kuykendall never produced these emails and the emails were deleted from his Gmail account, rendering them irretrievable.  Accordingly, with regard to Mayor Kuykendall's private Gmail account, Riley has made a showing that at least some of the spoliation occurred after Defendants' duty to preserve had arisen.

### b.   Culpable State of Mind

"Courts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith—that is required before sanctions are appropriate."  *Surowiec*, 790 F.Supp.2d at 1006 (internal quotation and citation omitted).  "Nor is there consensus as to how the level of culpability is to be determined, or what prejudice, if any, may be presumed from culpable conduct."  *Id.* at 1006–07.  However, it is clear that "[a]n allegedly spoliating party's culpability must be determined case-by-case." *Id.* at 1007.

### 1.   Mayor Kuykendall and City Employee's City-Assigned Email Addresses

In this case, Defendants argue that "there is no evidence that City emails were deleted except in the exercise of normal city practice; that does not constitute destruction with any culpable state of mind."  (Doc. 285 at 14).  From the facts presented at this stage of the proceedings, it appears that through the combination of Mayor Kuykendall's personal email retention policy and the IT policies of the City of Prescott, emails potentially relevant to this litigation that were sent to and from Mayor Kuykendall's city-assigned email address would, under normal circumstances, not be preserved for more

than approximately 45 days.[17]  Thus, any email relevant to this litigation created before approximately mid-January, 2011,[18] would have been destroyed prior to March 1, 2011. Defendants have produced emails retrieved from city-assigned email addresses that post-date March 1, 2011, and Riley has not made a factual showing that Defendants deleted emails from city-assigned addresses after March 1, 2011.

Nonetheless, Defendants have not attempted to explain why the "normal city practices" exercised here fail to follow Arizona public record requirements.  Moreover, Defendants have not satisfactorily explained why they failed to preserve emails between city employees and board members of an entity (YHS) that has a contract with the City. Defendants claim that if any relevant emails had existed, then Mayor Kuykendall's assistant would have classified them as "non-city business" and deleted them accordingly.  Such non-compliance with Arizona state law and misclassification of emails is, at best, grossly negligent and, at worst, willful.  Accordingly, the Court finds that the totality of the facts presented show that Defendants deleted emails related to this lawsuit, and did so with sufficient culpability to warrant sanctions.

### 2.   Mayor Kuykendall's Private Gmail Account

In this case, Defendants argue that "there is no evidence that any City of Prescott Defendant deleted any 'evidence' from the Mayor's Gmail account" and that "the Google Declaration leaves room for the possibility that the emails are missing because of some issue on Google's end."  (Doc. 285 at 14–15).  Here, Defendants' explanations for their failure to preserve evidence are not reasonable.  From the facts presented at this stage of the proceedings, it is evident that emails related to this lawsuit remained in Mayor Kuykendall's Gmail account over one year after Mayor Kuykendall received Riley's Notice of Claim.   Despite numerous requests for production, Mayor Kuykendall

---

[17] Defendants allege that any emails related to Riley would have been classified as "non-city business" by Mayor Kuykendall's assistant, Mayor Kuykendall's assistant deletes such emails approximately every two weeks, and the City's back-up server only retains deleted emails for 30 days.  (DCSOF ¶¶ 39, 58–64, 69–71, 114–17).

[18] Mid-January is approximately 45 days before March 1, 2011.  Riley was terminated on November 12, 2010.

produced nothing from his Gmail account.  After a subpoena to Google revealed that emails existed, Mayor Kuykendall continued to refuse production and the emails were deleted.  Even if Defendants' argument that Google deleted the emails was factually accurate, it does not explain Mayor Kuykendall's refusal to produce the emails during the year post-Notice of Claim that the emails indisputably existed.  Accordingly, the Court finds that Mayor Kuykendall acted willfully and in bad faith, and, thus, with a culpable state of mind.

### c.      Relevance to the Claims

Riley has shown that the evidence destroyed was likely relevant to her claims. Riley discovered multiple emails in Goodman's email account that were sent to Mayor Kuykendall or his assistant.   These emails indicate that Mayor Kuykendall was discussing Riley and YHS with Goodman both before and after the protest.  (PSOF ¶ 67, Exs. 23–25).  Additionally, from Google, Riley discovered the existence of nine emails which indicate that Mayor Kuykendall was corresponding with his assistant, Goodman, and Edelbrock during the critical period of October 26–29, 2010.   (PSOF ¶ 74). Defendants produced none of these emails.  Accordingly, the Court finds that Defendants destroyed emails relevant to this case.

### d.      Appropriate Sanctions

Riley argues that Defendants' actions entitle her to claim-dispositive sanctions. Specifically, Riley asks the Court to "find that the spoliated evidence would have established that (1) Defendants intentionally interfered with Riley's employment relationship causing her termination, and (2) Defendants' conduct was improper." (Doc. 271 at 19).  Here, such a sanction is claim-dispositive because it would effectively be a finding that the two disputed elements of Riley's tortious interference claim are not in genuine dispute.  *See*, *supra*, II.C.2.b.  Riley also requests an award of attorneys' fees and costs incurred in connection with seeking the spoliated evidence and incurred in connection with this motion.  (*Id.* at 21).  The Court "must determine which sanction best (1) deters parties from future spoliation, (2) places the risk of an erroneous judgment on

the spoliating party, and (3) restores the innocent party to their rightful litigation position." *Surowiec*, 790 F.Supp.2d at 1008 (internal quotation and citation omitted).

There is a five-part test to determine whether a sanction determining liability in favor of one party is just: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011) (internal citation omitted).

Here, the first two factors favor Riley. Because the Court and the public have a strong interest in judicial efficiency and the prompt resolution of litigation, Defendants' failure to preserve evidence, and the resulting delay caused by discovery disputes and the instant motion for sanctions, weigh in favor of granting the factual findings sought by Riley. *See Surowiec*, 790 F.Supp.2d at 1009.

The third factor weighs neither for, nor against, granting the factual findings sought by Riley. The third factor, prejudice, "looks to whether the spoliating party's actions impaired the non-spoliating party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (citation and brackets omitted). Here, it is apparent that Riley has been prejudiced by the spoliation. However, Riley did have access to Goodman's email account and discovered multiple emails supporting her claims. Thus, Riley possesses at least some of the relevant emails that Defendants destroyed. Additionally, Defendants, Goodman, Boks, and others have all provided deposition testimony stating that Defendants did not play a role in YHS's decision to terminate Riley's employment and that relevant emails never existed. Although Riley has offered substantial evidence that relevant emails existed and challenging the credibility of the various deponents, their testimony nonetheless indicates that the previous existence (and destruction) of any "smoking gun" emails is speculation. Consequently, the Court finds that Riley has not demonstrated sufficient prejudice for the third factor to weigh in her favor.

The fourth and fifth factors weigh against granting the factual findings sought by Riley.  Here, there is a genuine dispute of fact which public policy favors be resolved on its merits.  Moreover, granting the factual findings Riley seeks would hinder the resolution of Riley's § 1983 claim on its merits.[19]  Consequently, the Court finds that a lesser sanction would correct any interference with a rightful decision of the case attributed to the spoliation.  *See Leon*, 464 F.3d at 959 (quoting *Rimkus Consulting Group, Inc.v. Cammarata*, 688 F.Supp.2d at 618 (S.D. Tex. 2010)) ("When a party is prejudiced, but not irreparably, from the loss of evidence that was destroyed with a high degree of culpability, a harsh, but less extreme sanction than dismissal or default is to permit the fact finder to presume that the destroyed evidence was prejudicial.").  Accordingly, the Court finds that a sanction granting the factual findings Riley seeks would be inappropriate in this case.

However, the Court finds adverse inference instructions to be warranted to the extent Defendants' spoliation affects Riley's ability to prove her claim.  The Parties shall submit proposed adverse inference instructions with the other jury instructions to be filed before trial.

### 4.    Attorneys' Fees

Riley also requests an award of attorneys' fees and costs incurred in connection with seeking the spoliated evidence and incurred in connection with this motion.  "Under its 'inherent powers,' a district court may also award sanctions in the form of attorneys' fees against a party or counsel who acts in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Leon*, 464 F.3d at 961 (internal quotation and citation omitted).  "Before awarding such sanctions, the court must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith."  *Id.* (citation omitted).  "A party demonstrates bad faith by delaying or disrupting the litigation or

---

[19] Because Riley's tortious interference and § 1983 claims rely on some overlapping factually allegations (that Defendants threatened YHS with economic harm unless YHS terminated Riley), dispositive factual findings for the tortious interference claim could be used collaterally to resolve disputed issues of fact in Riley's § 1983 claim. Riley, however, has not asked for sanctions in relation to her § 1983 claim.

1    hampering enforcement of a court order." *Id.* (internal citation omitted). "The bad faith

2    requirement ensures that the district court's exercise of its broad power is properly

3    restrained, and preserves a balance between protecting the court's integrity and

4    encouraging meritorious arguments." *Id.* (internal quotation and citation omitted).

5    "Additionally, the amount of monetary sanctions must be reasonable." *Id.* (internal

6    quotation and citation omitted). The Court has already found that Defendants acted in

7    bad faith. Accordingly, Riley is entitled to her *reasonable* attorneys' fees incurred in

8    connection with this motion and seeking spoliated evidence.

9         The Parties are directed to confer in good faith to resolve any disputes concerning

10   the amount of reasonable expenses and fees. *See* L.R. Civ. 54.2(d)(1). If the Parties are

11   unable to agree, Riley may file a motion pursuant to Local Rule 54.2. Any such motion

12   shall be filed, with a supporting memorandum, on or before March 28, 2014, with the

13   response and reply briefs due in accordance with the time periods provided in Local Rule

14   54.2(b)(3) and (4).

15        **B.   Defendants' Motion**

16        Defendants' Response (Doc. 285) to Riley's Motion for Partial Summary

17   Judgment (Doc. 271) includes a Cross-Motion for Discovery Sanctions. (Doc. 285 at 23–

18   25). Defendants' allege that Riley deleted numerous emails that may have been relevant

19   to this litigation and even closed an email account. (*Id.*). Defendants' argue that if the

20   Court evaluates Riley's conduct through the same lens it uses to evaluate Defendants'

21   conduct, then Riley's actions warrant "either default or an adverse inference, and

22   attorneys' fees." (*Id.* at 24).

23        As explained above,

> [a] party seeking sanctions for spoliation of evidence must
> prove the following elements: (1) the party having control
> over the evidence had an obligation to preserve it when it was
> destroyed or altered; (2) the destruction or loss was
> accompanied by a 'culpable state of mind;' and (3) the
> evidence that was destroyed or altered was 'relevant' to the
> claims or defenses of the party that sought the discovery of
> the spoliated evidence[.]

*Surowiec*, 790 F.Supp.2d at 1005.   Here, Defendants cannot be entitled to sanctions against Riley because Defendants have made no attempt to satisfy the third element, relevance.   (*See* Doc. 285 at 23–25; Doc. 297).   Even assuming that Defendants' factual allegations regarding Riley's conduct are true, Defendants have not made any showing regarding what, if any, evidence possibly could have been lost that may be relevant to Riley's claims or Defendants' defenses.   Indeed, Defendants have not even speculated as to what relevant evidence may have been discovered in Riley's email.   Accordingly, the Court denies Defendants' Cross-Motion for Discovery Sanctions (Doc. 285).

## IV.   CROSS-MOTIONS TO STRIKE

Both Parties have cross-motions to strike various portions of the several statements of fact submitted to support their motions for summary judgment and cross-motions for discovery sanctions.   Riley moves (Doc. 296) to strike Defendants' "Controverting Statement of Facts Regarding Plaintiff's Additional Statement of Facts in Opposition to Defendants' Motion for Summary Judgment" (Doc. 288) because "it is not authorized by L.R. Civ. 56.1."   (Doc. 296 at 1).   Additionally, Riley "requests that the Court strike legal arguments that Defendants improperly raised in their oppositions [(Docs. 267, 286)] to Plaintiff's statement of facts."   (*Id.*).   Responding that what's good for the goose is good for the gander, Defendants filed a Cross-Motion to Strike Riley's "Response to Defendants' Supplemental Statement of Facts in Support of Defendants' Cross Motion for Sanctions" (Doc. 292) and various "legal arguments" couched as "facts" in Riley's other statements of fact (Docs. 280, 292, 294-1, 295, 295-2).

First, the Court notes that it has not relied on either Parties' objected-to statements of facts (Docs. 292, 296) when reaching its decisions on the four summary judgment and sanctions motions.   Therefore, whether or not either filing is authorized by the Local Rules is moot.   Second, to the extent that both Parties base their cross-motions to strike on the fear that this Court will be unduly swayed by the opposing party's legal arguments couched as factual contentions, the Court reminds both parties that the Court is fully capable of delineating between factual statements supported by the record and arguments,

no matter their *nom de guerre*.  As such, the Parties have no cause for dread; the Court has not misconstrued any legal arguments contained in the multiple statements of fact as factual evidence of a genuine dispute over any material facts.  In sum, the Court finds that the quantity and form of the Parties' various statements of fact has not prejudiced either party.  Accordingly, both Parties' Motions to Strike (Docs. 296, 301) are denied.

**VI.   CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 266) and Riley's Motion for Partial Summary Judgment (Doc. 271) are DENIED.

**IT IS FURTHER ORDERED** that Riley's Motion for Discovery Sanctions (Doc. 271) is GRANTED in part and DENIED in part as set forth in this Order.  As set forth in this Order, the Parties shall submit proposed adverse inference instructions with the other jury instructions to be filed before trial.

**IT IS FURTHER ORDERED** that the Parties are directed to confer in good faith to resolve any disputes concerning the amount of reasonable expenses and fees related to Defendants' spoliation.  *See* L.R. Civ. 54.2(d)(1).  If the Parties are unable to agree, Riley may file a motion pursuant to Local Rule 54.2.  Any such motion shall be filed, with a supporting memorandum, on or before March 28, 2014, with the response and reply briefs due in accordance with the time periods provided in Local Rule 54.2(b)(3) and (4).

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion for Discovery Sanctions (Doc. 285) is DENIED.

**IT IS FINALLY ORDERED** that Riley's Motion to Strike (Doc. 296) and Defendants' Cross-Motion to Strike (Doc. 301) are DENIED.

Dated this 18th day of February, 2014.

James A. Teilborg
Senior United States District Judge